UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,               Case No. 21-cv-10622

vs.                                HON. MARK A. GOLDSMITH

ANNETTA POWELL, et al.,

               Defendants.

_____/

**OPINION & ORDER**
**(1) DENYING GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 56)**
**AND (2) DENYING DEFENDANTS' MOTION FOR ORAL ARGUMENT (Dkt. 104)**

Before the Court is the Government's motion for summary judgment (Dkt. 56) seeking to

(i) permanently enjoin Defendant Annetta Powell and her tax preparation companies—Defendants

Alliance Tax Services, Inc.; Nationwide Tax Services, Inc.; Tax Expert Stores, Inc.; United Tax

Services, Inc.; Top Financial Specialists, Inc.; United Financial Team Corporation, and Speedy

Tax Stores Corporation (collectively, The Tax Experts)[1]—from acting as tax return preparers, and

(ii) disgorge $703,398.96 from Defendants as an approximation of net profits they made on

---

[1] Also a named Defendant is Jasmine Powell, Annetta Powell's sister and a preparer for The Tax Experts. The Government appears not to seek summary judgment against Jasmine Powell; the motion requests relief against "Annetta Powell and her businesses." Mot. at iv. The Government's motion references Jasmine Powell only to identify her as one of the preparers who engaged in Defendants' allegedly fraudulent activity. See Br. in Supp. Mot. at 35–36. This opinion refers to Annetta Powell as "Powell" and to Jasmine Powell by her full name.

1

fraudulent returns filed for preparation years 2019–2021.  For the reasons that follow, the Court

denies the Government's motion.[2]

## I. BACKGROUND

Between 2009 and 2021, Powell has owned and operated at least eight distinct tax

preparation businesses under the trade name "The Tax Experts" at five locations in Michigan.[3]

---

[2] In addition to the motion, the briefing includes Defendants' response (Dkt. 81) and the
Government's reply (Dkt. 97).  Additionally, the parties filed corrections as to their positions on
their statements of material facts.  See Def. Notice (Dkt. 108); Gov't Corrected Reply (Dkt. 111).

Defendants also move for oral argument on the Government's motion (Dkt. 104).  Because oral
argument will not aid the Court's decisional process, the motions will be decided based on the
parties' briefing.  See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).  Accordingly, the Court
denies Defendants' motion.

[3] More specifically, the Government asserts the following, which Powell does not deny, see Def.
Stat. of Material Facts (SOMF) ¶¶ 1–11:

- Beginning in December 2009, Powell operated a tax preparation business at two locations
  in Detroit, which she operated under the trade name "The Tax Experts" beginning in 2010
  per an agreement with Jeanisia Allen, owner and operator of The Tax Experts, Inc.  Gov't
  SOMF ¶¶ 1–2.  The businesses were located on Joy Road and East 7 Mile Road in Detroit,
  Michigan.  Id. ¶ 1.

- Powell incorporated Alliance Tax Services, Inc. on September 1, 2011, and operated it at
  the Joy Road and 7 Mile locations under the trade name "The Tax Experts" until 2012.  Id.
  ¶ 3.

- Powell incorporated Nationwide Tax Services in September 2011 and operated it at the Joy
  Road location, 7 Mile location, and two additional locations—on Conant Street in Detroit
  and on West Huron Street in Pontiac—under the trade name "The Tax Experts" for
  preparation years 2013–2016.  Id. ¶ 4.

- Powell incorporated Tax Experts Stores, Inc. in August 2013 and operated it as owner and
  president for an unspecified period of time.  Id. ¶ 6.

- Powell incorporated United Tax Services, Inc. in December 2014 and operated it as owner
  and president for an unspecified period of time.  Id. ¶ 8.

- Powell incorporated Top Financial Specialists, Inc. in November 2016 and operated it as
  owner and president during the 2017 and 2018 tax preparation seasons. Id. ¶¶ 9–10.  Powell

Powell's businesses used the trademarks and software of "The Tax Experts, Inc.," which was separately owned by Jeanisia Allen.[4]  Powell's only tax preparation business still in operation is Speedy Tax Stores Corporation, which does not utilize trademarks or materials from The Tax Experts, Inc.  See Br. in Supp. Resp. at 15–16.

According to Defendants, Powell "did not prepare any tax returns," and rather "relied upon the managers at each store and the training, materials, and software provided by The Tax Experts, Inc."  Id. at 13.  Defendants emphasize that Powell "has no formal training in tax law or tax preparation."  Id. at 16.  Rather, she "concentrates on marketing the business" and in the past has "relied upon The Tax Experts, Inc. to provide the necessary training to her office managers and tax preparers."  Id. at 16–17 (citing Powell Aff. (Dkt. 82-2)).

---

and Top Financial Specialists, Inc. opened a new business on S. Dort Highway in Flint, Michigan, where they used Tax Experts trademarks and software.  Id. ¶ 10.

- Powell incorporated United Financial Team Corporation in December 2016 and operated it as owner for an unspecified period of time.  Id. ¶ 11.

- Powell incorporated Tax Experts Team, Inc. in December 2016 and operated it as president under the trade name The Tax Experts during the 2019–2021 tax preparation seasons.  Id. ¶ 12.

- Powell incorporated Speedy Tax Stores Corporation in November 2021 and operated it as owner and president for an unspecified period of time.  Id. ¶ 11.  Powell opened this corporation after learning that Allen's The Tax Experts was ceasing operations.  Id.

To explain this series of separate business ventures, Defendants submit that Powell has "changed the name of her stores on several occasions" as a "result of seeking the best marketing strategy." See Br. in Supp. Resp. at 24.

[4] In United States of America v. Allen et al., No. 21-cv-10620 (E.D. Mich.), the Government brought claims against Allen and several of Allen's businesses that were similar to the claims it asserts here against Powell and Powell's businesses.  Allen has been resolved; Allen agreed to an injunction on her provision of tax preparation services, see 5/13/22 Stipulated O. and J. (No. 21-cv-10620, Dkt. 45), and the Government agreed to dismiss its demand for disgorgement, see 4/14/23 Stipulated O. (No. 21-cv-10620, Dkt. 62).

The parties agree that employees at Powell's tax preparation businesses engaged in some degree of fraudulent activity, but they have very different views of the scale of the issue and the source of culpability.  At a high level, the Government alleges that preparers manipulated income to achieve maximum returns for their customers—often by intentionally reporting an income that hit the "sweet spot" or "magic number" at which the customer was eligible for the maximum Earned Income Tax Credit (EITC).  Br. in Supp. Mot. at 10, 10 n.31.  As the Government emphasizes, 26 U.S.C. § 6695(g) prohibits preparers from claiming the EITC without conducting proper "due diligence."

Also at a high level, Defendants insist that, in general, their tax preparers honestly reported the income they were given; "[c]lients were the sole source of information on their return."  Br. in Supp. Resp. at 2–3 (citing Powell Aff; Jamal Tolbert Return (Dkt. 84-10) (example client return)).  In Defendants' view, "[t]his entire case may be summarized as a case in which the Government's witnesses are individual taxpayers that claim that the Court should ignore the questionnaires that they personally filled out, signed, and provided to their preparer versus the tax return preparers who state that they relied upon the information provided by the taxpayers to prepare the taxpayers' tax returns . . ."  Id. at 4.

In addition to blaming their customers for any inaccuracies in the returns they prepared, Defendants also point to two alleged bad apples who were terminated from Powell's employment: Brandy Hawkins and Sherry Neely.  Id. at 6 (citing Powell Aff.).  The Government—which relies on Brandy Hawkins's representations to support its theory of this case—asserts that Powell fired Brandy Hawkins for refusing to assist in Powell's scheme, while Powell insists that she fired

4

Brandy Hawkins for perpetrating some of the activities challenged by the Government.[5]  The parties similarly dispute the credibility of Jabrea Irvin, another former preparer who now supports the Government's position.  See, e.g., Reply at 12–13 (relying on statements made by customers, B. Hawkins, and Irvin to support theory of case (citing Hawkins Decl. ¶5 (Dkt. 56-2); B. Hawkins Suppl. Decl. ¶5 (Dkt. 97-12), Irvin Decl. ¶ 5 (Dkt. 56-3))).[6]

The Court proceeds by discussing the four distinct types of fraud allegedly perpetrated by Defendants.

**1.  Schedule C Manipulation**

Schedule C is the form on which a taxpayer reports "Profit or Loss from Business, Sole Proprietorship."  The Government alleges that Defendants and their employees prepared

---

[5] The Government argues that in April 2021, after the complaint in this action was filed, Powell instructed Brandy Hawkins—manager of the Flint location—to alter customer files, including by changing dates on paperwork and completing incomplete forms.  Br. in Supp. Mot. at 38.  When Brandy Hawkins refused to do so, Powell fired her.  Id.; see also Reply at 12 (citing B. Hawkins Supp. Decl. ¶ 1 (Dkt. 97-12)).  Defendants call Brandy Hawkins's accusations "false" and submit that she was "fired for filing false returns."  Br. in Supp. Resp. at 10 (citing Powell Aff.).

To distinguish preparer Brandy Hawkins from Defendants' customer Waekelia Hawkins, the Court refers to these individuals by their full names and—when citing their declarations or deposition transcripts—by the initials of their first names.

Defendants also submit that Neely was fired as part of the same investigation that resulted in Brandy Hawkins's termination.  See Br. in Supp. Resp. at 42–43.  While resisting Defendants' efforts to heap blame on Neely as opposed to Powell, the Government does not dispute this characterization.  See Br. in Supp. Mot. at 37.

[6] The Government alleges that, during preparation year 2019, the IRS refused to process a number of returns prepared by The Tax Experts, and Powell instructed preparers at the Flint location to fraudulently change the forms and supporting customer files.  Br. in Supp. Mot. at 23.  The Government submits that Irvin—one of the preparers at the Flint location—refused to change the files, and Powell had her fired.  Id. at 24.  Powell denies that she "ask[ed] Jabrea Irvin . . . to do anything improper."  Br. in Supp. Resp. at 6 (citing Powell Aff.).  Defendants characterize preparer Jabrea Irvin as "a close associate and supporter of Brandy Hawkins" whom Powell directed not to report Household Help (HSH) without the proper documentation, but "Irvin refused to contact the clients and quit" before Powell fired Brandy Hawkins.  Id. at 34–35.

fraudulent Schedule C forms that reported either (i) non-existent businesses and related income and/or expenses, or (ii) fabricated expenses and/or income for customers who owned existing small businesses.  See Br. in Supp. Mot. at 10.

In the Government's view, Tax Experts preparers were trained to (i) suggest an amount of income and expenses for customers to report, and then (ii) direct the customers to redo their taxpayer applications to fill in the numbers suggested by the preparers for Schedule C businesses. Id. at 11–12.  The Government asserts that preparers did not request any supporting documents or ask questions about income or expenses.  Id.  Though preparers purported to rely on "Net Profit from Business" worksheets provided by the Tax Experts, these forms either (i) were filled out by preparers or someone else other than the customers, or (ii) reflected numbers provided to the customers by the preparers.  Id. at 12.  The Government relies on the statements of two former preparers—Brandy Hawkins and Irvin—and the testimony of 15 customers applicable to 47 total returns compiled in a table labeled as Table 1.  See id. at 11–12 (citing B. Hawkins Decl. ¶ 5; Irvin Decl. ¶ 5).[7]

Conversely, relying on affidavits executed by tax preparers, Defendants deny that preparers were trained to suggest to customers that their refunds could be increased by adding a Schedule C business, or to direct clients to redo their questionnaires.  See Br. in Supp. Resp. at 3.  Defendants submit that the testimony of the taxpayers deposed by the Government is "false."  Id.  Defendants also consider the sample of customer accounts compiled by the Government to be "misleading as

---

[7] Table 1 compiles tax return data from 15 customers the Government has deposed and whose tax returns included a Schedule C claiming a business loss of $5,000 or more, allegedly fabricated by preparers.  Br. in Supp. Mot. at 12–16.  The Government also provides three examples of customers whose experiences with Tax Experts prepares demonstrated these trends, two of which refer to preparer Tanea Berry (customers Waekelia Hawkins and Cierra Banks), and one of which does not name the offending preparer because his wife interacted with the tax preparers (customer Henry Hill).  See id. at 16–18.

it only shows 48 returns [apparently meaning 47 returns] out of the approximately 13,000 returns Ms. Powell produced to the Government during these proceedings." Id. Additionally, "many of the returns on Table 1 were prepared at the Flint store under the management of Brandy Hawkins," whom Defendants view as an untrustworthy perpetrator of fraud. Id.[8]

### 2. Household Help

"Household Help" (HSH) is a type of income paid to individuals who are hired to perform household work, and taxes for this income must be withheld by the employers—i.e., the persons for whom the individuals perform the household work. See Br. in Supp. Mot. at 20, 20 n.74.[9] If the wages from HSH work exceed a certain amount—e.g., $2,400 for tax year 2022—the employer must report the wages paid and the withholding on a Form W-2. See Br. in Supp. Mot. at 20 (citing IRS Publication 926 (2022)). Workers are not considered HSH employees if they either (i) do

---

[8] As to the three specific customer accounts highlighted in the Government's motion, Defendants submit that the two applicable tax preparers—Tanea Berry and Tiara Childress—dispute the Government's characterizations of their actions in their affidavits. See Br. in Supp. Resp. at 4 (citing Berry Aff. ¶¶ 35–37 (Dkt. 82-6); Childress Aff. ¶¶ 19–33 (Dkt. 82-9)). And the third allegedly offending preparer, according to Defendants, was Sherry Neely, whom Defendants submit Powell terminated for preparing false returns. Id.

Berry, who prepared Waekelia Hawkins's 2020 return, states that the allegations of Waekelia Hawkins are completely false. Br. in Supp. Resp. at 29 (citing Berry Aff. ¶¶ 35–37). Defendants insist that Berry prepared Waekelia Hawkins's return with the information Hawkins provided. Id. The Government agrees that Waekelia Hawkins's testimony contradicts the statements of Berry. Reply at 11.

Defendants also deny Banks's accusation that Childress directed Banks on how to complete her application; in Defendants' view, Banks "came to Ms. Childress' desk with the Tax Payer Application already completed" and "signed under penalty of perjuries that the information in the questionnaires was true and accurate," rendering Banks's claims of Childress's fabrication "completely false." Br. in Supp. Resp. at 30 (citing Childress Aff. ¶¶ 19–33). The Government agrees that Banks's testimony contradicts the statements of Childress. Reply at 11.

[9] Br. in Supp. Resp. at 3 (citing IRS Publication 926 (2022), Household Employer's Tax Guide, available at https://www.irs.gov/publications/p926 [https://perma.cc/27U6-A2TJ]).

work of a non-household nature or (ii) do work of a household nature but provide their own supplies and offer their services to the general public; these workers are sole proprietors or independent contractors required to report their income on Schedule C.  See id. at 20–21 (citing IRS Publication 926 (2022)).

The Government alleges that the HSH income reported on forms prepared by Defendants was either (i) "entirely fabricated"—i.e., the returns "either reflected numbers that the preparers told the customers to write on the Form or were filled out by someone other than the customers"; or (ii) improperly reported as HSH even though the income did not qualify as HSH and should instead have been reported as self-employment income on a Schedule C.  Id. at 21–23.  The Government argues that, by falsely reporting HSH and evading submission of the proper Schedule C information, Defendants' customers avoided the requirement to pay self-employment tax for Social Security and Medicare.  Id. at 21.  Additionally, manipulating reported income allowed Defendants to "falsely claim the EITC on customers' tax returns."  Id. at 22.

The Government also points to a specific incident of fraud in which Powell was allegedly directly involved, relying on Brandy Hawkins's and Irvin's declarations.[10]

_____

[10] The Government alleges that, during preparation year 2019, the IRS refused to process a number of returns prepared by The Tax Experts claiming HSH income, and Powell instructed preparers at the Flint location to "change the Household Help income claimed on the returns to income from fake Schedule C businesses, and to fill out the Tax Experts self-employment forms to put in the customer files to fraudulently provide support for the false claims made on the returns."  Br. in Supp. Mot. at 23.  The customers were not present for these changes, and customer files did not contain receipts documenting income or expenses for Schedule C businesses.  Id. at 23–24.  The Government submits that Irvin—one of the preparers at the Flint location—refused to change the files, and Annetta Powell had her fired.  Id. at 24.  Defendants argue that Powell directed Irvin not to report HSH without the proper documentation, but "Irvin refused to contact the clients and quit" before Powell fired her.  Br. in Supp. Resp. at 34–35.

Powell denies that she "ask[ed] Jabrea Irvin, Brandy Hawkins or any preparer to do anything improper."  Br. in Supp. Resp. at 6 (citing Powell Aff.).

The Government provides a table (Table 2) of 30 returns filed by 21 customers who either (i) were deposed by the Government or (ii) provided the IRS with declarations, and whose returns reflected HSH income that was either fraudulent or mischaracterized.  See Br. in Supp. Mot. at 24–26.  The Government further discusses three specific examples of customers whose returns reflect HSH entries which they did not provide to their preparers: Lorie Thomas, Cantrella Rutledge, and Diamond Garner.  Id. at 26–28.

In response, Defendants insist that they "did not fabricate information on the return"; rather "[t]he taxpayer supplied the information."  Br. in Supp. Resp. at 5.  Defendants argue that Powell's affidavit disputes the claim that Defendants willfully misreported HSH and failed to properly report self-employment taxes.  Id. (citing Powell Aff.).  Defendants consider the Government's table "misleading as this Table only shows 30 returns out of the approximately 13,000 returns Ms. Powell produced to the Government during these proceedings."  Br. in Supp. Resp. at 6–7.  They attempt to discredit the customer testimony underlying the Government's allegations.[11]

### 3.  Improper Filing Statuses

"Head of Household" status can be claimed only if (i) the taxpayer is unmarried or considered unmarried at the end of the year, (ii) the taxpayer paid more than half the cost of keeping up a home, and (iii) qualifying dependents lived in the home for more than half of the year.  See Br. in Supp. Mot. at 31, 31 n. 126 (citing 26 U.S.C. § 2(b)).

The Government argues that "Defendants prepare[d] tax returns falsely claiming 'Head of household' filing status to increase the amount of the customers' standard deduction and refund,

---

[11] For example, Defendants note that the tax preparers for customer Cantrella Rutledge have signed affidavits disputing Rutledge's charge that they told her what inform to enter on her form.  Br. in Supp. Resp. at 38.  They also point to Diamond Garner as an example of a customer who declined to tell her tax preparer all of the jobs she had worked.  Id. at 33–34 (citing Garner Dep. 20–21, 51 (Dkt. 55-56)).

when the Defendants know that the customer does not qualify for head of household filing status or claim 'Single' filing status rather than the less-advantageous 'Married Filing Separately' filing status." Id. at 31.

Defendants insist that they "relied on information provided by the taxpayer to prepare their tax return including Head of Household filing status." Br. in Supp. Resp. at 8 (citing Powell Aff.; Broadnax Aff. ¶ 15-23 (Dkt. 82-8)).[12]

### 4. Identification of Preparer

26 U.S.C. § 6695(c) requires that tax return preparers identify themselves on returns they prepare with their name and Preparer Tax Identification Number (PTIN).

The Government submits: "Multiple customers confirmed that their tax returns identify a different individual than the person who prepared the returns." Br. in Supp. Mot. at 31.

Defendants assert that "[t]he preparers used their own PTIN to prepare the returns." Br. in Supp. Resp. at 8 (citing several affidavits). They further state: "The policy of The Tax Experts was that the person who prepared the tax return should sign the tax return and use their personal [PTIN]. On rare occasions, a preparer who started a return may have been required to leave and let another preparer complete the return. In those rare instances either of the preparers may have signed the tax return so long as they used their own PTIN." Id. at 39–40 (citing Smith Aff. ¶ 28, 37 (Dkt. 83-7); Berry Aff. ¶ 28; Powell Aff. ¶ 147).

---

[12] One example of a customer who claimed Head of Household status and who is highlighted by the parties is Christopher Clemons, whose return was prepared by Defendants' employee Royanna Rhimes. In the Government's view, Clemons testified that "Tax Experts preparers knew he was married when they filed his returns claiming 'Single' status." Reply at 16. Defendants assert that Rhimes disputes this characterization. Br. in Supp. Resp. at 39 (citing Rhimes Aff. ¶ 26 (Dkt. 83-5) ("Based on the information Christopher Clemons communicated to me, Head of Household was the correct designation for his tax return.")).

Based on the four categories of allegations identified above, the Government filed suit seeking a permanent injunction under 26 U.S.C. § 7407, see Am. Compl. ¶¶ 87–99 (Dkt. 50), and a permanent injunction and disgorgement under 26 U.S.C. § 7402(a), id. ¶¶ 100–107.  Upon Defendants' withdrawal of their jury demand, see 2/3/22 Stip. & Order (Dkt. 22), this case is scheduled for a bench trial before the undersigned.  The parties have agreed that Defendants are preliminarily enjoined from preparing or filing tax returns before the date of trial.  See 2/16/23 Order (Dkt. 80).  Now before the Court is the Government's motion for summary judgment.

## II.  ANALYSIS[13]

The Government seeks (i) a permanent injunction preventing Defendants from delivering tax preparation services pursuant to 26 U.S.C. § 7407, and (ii) a permanent injunction and disgorgement of Defendants' net profits under an unjust enrichment theory pursuant to 26 U.S.C. § 7402(a).  The Court addresses each ground in turn.

### A.  Permanent Injunction Under § 7407

To obtain a § 7407 injunction prohibiting Defendants from acting as tax preparers, the Government must show: (i) that Defendants are "income tax preparers" within the meaning of § 7701(a)(36); (ii) that Defendants "continually or repeatedly engaged in" conduct specifically prohibited under § 7407(b)(1)(A)–(D); and (iii) that an "injunction prohibiting such conduct would not be sufficient to prevent such person's interference" with the internal revenue laws.  United

---

[13] In assessing whether the Government is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

States v. Elsass, 978 F. Supp. 2d 901, 938 (S.D. Ohio 2013), aff'd. 769 F.3d 390 (6th Cir. 2014) (quoting § 7407(b)).

The parties do not dispute that Defendants are income tax preparers.[14] The Court proceeds by considering the categories of prohibited conduct in which Defendants allegedly "continually or repeatedly engaged" to determine whether Defendants engaged in conduct that merits an injunction.

### 1. Sections 6694(a) and (b): Unreasonable, Willful, or Reckless Understatements of Liability

Section 7407 allows for a permanent injunction if a tax return preparer has "engaged in any conduct subject to penalty under section 6694." § 7407(b)(1)(A).

Title 26 U.S.C. § 6694(a) makes it a violation for a tax preparer to take an "[u]nreasonable position" on "any return or claim of refund" resulting in "an understatement of liability." § 6694(a)(1)(A), (a)(2). An "unreasonable position" is one for which there was not "substantial authority," § 6694(a)(2)(A), and for which there was not "reasonable cause for the understatement" and "good faith" on the part of the preparer, § 6694(a)(3).

Title 26 U.S.C. § 6694(b) makes it a violation for a preparer to either (i) make "a willful attempt in any manner to understate the liability for tax on the return or claim," § 6694(b)(2)(A); or (ii) exhibit "a reckless or intentional disregard of rules or regulations," § 6694(b)(2)(B).

The Government argues that Defendants "repeatedly violate §§ 6694(a) and (b) by preparing tax returns containing phony credits and deductions (and employing preparers who

---

[14] A "tax return preparer" is "any person who prepares for compensation, or who employs one or more persons to prepare for compensation, any return of tax imposed by this title or any claim for refund of tax imposed by this title." 26 U.S.C. § 7701(a)(36)(A). The Government asserts that Defendants fit this definition, see Br. in Supp. Mot. at 40, and Defendants do not deny that they are tax return preparers, see Br. in Supp. Resp.

prepare these false returns)"—in particular, by submitting "fake Schedule C business income and expenses and fake Household Help income."  Br. in Supp. Mot. at 41.  As demonstrated by the Government's caselaw, the conduct alleged by the Government—if in fact undertaken by Defendants—constitutes conduct proscribed by § 7407.[15]

However, material issues of fact pervade the question of whether Defendants engaged in the proscribed conduct.  The Government relies on the deposition testimony of 15 customers to allege that Defendants fabricated information on Schedule C losses, Br. in Supp. Mot. at 12–18, and the deposition testimony or declarations of 21 customers to allege that Defendants fabricated reported HSH, id. at 24–28.  Defendants, conversely, contend that the customer testimony is "false," Br. in Supp. Resp. at 3, and they present the signed affidavits of 17 tax preparers employed by Defendants who deny that they fabricated any reported information, contradicting the testimony of the customers.[16]  The Government argues that these affidavits are "carbon-copies of one another," Reply at 24, but these affidavits—though repeating some of the same assertions—discuss

---

[15] See United States v. Stinson, 239 F. Supp. 3d 1299, 1319 (M.D. Fla. 2017), aff'd, 729 F. App'x 891 (11th Cir. 2018) (entering permanent injunction following bench trial and finding defendant violated § 6694 where he "completely fabricated expenses, wrongfully claimed . . . head of household, . . . and fabricated businesses"); United States v. Sonibare, 504 F. Supp. 2d 566, 572 (D. Minn. 2007) (granting Government's motion for summary judgment and entering permanent injunction under § 7407 where defendant "repeatedly prepared federal income tax returns that contain[ed] . . . false Schedule C businesses and false or inflated Schedule C business losses"); United States v. Baxter, 372 F. Supp. 2d 1326, 1329–1330 (M.D. Ala. 2005) (entering permanent injunction under §§ 7402 and 7407 following bench trial where there was "no doubt that [defendant's] repeated and false reporting on Schedules A and C and his manipulation of the EITC violated 26 U.S.C.A. §§ 6694 [and] 6695(g)").

[16] Specifically, Defendants present the affidavits of preparers Douglas Adams (Dkt. 82-5), Tanea Berry (Dkt. 82-6), Ajenae Bland (Dkt. 82-7), Tiara Childress (Dkt. 82-9), Princess Davis (Dkt. 82-10), Sabrina Farmer (Dkt. 82-11), Freddie Garland (Dkt. 82-12–82-14), Justyce Hollis (Dkt. 83-1), Zahri Horton (Dkt. 83-2), Ijuane Joseph Jones (Dkt. 83-3), Chardale Miller (Dkt. 83-4), Royanna Rhimes (Dkt. 83-5), Juwan Simmons (Dkt. 83-6), Alfredo Smith (Dkt. 83-7), Lyncora Tart (Dkt. 83-8), Kenyette Wadley (Dkt. 83-9), and Calvina Weems (Dkt. 83-10).

and deny the claims of specific customers whom the preparers remember serving. The Government acknowledges that the statements of certain tax preparers are "contradicted" by the testimony of customers. Id. at 9.

Additionally, the Government relies on the declarations of Brandy Hawkins and Irvin to insist that Powell intentionally ran a scheme to fabricate information on tax returns. In opposition to this theory, Defendants point to Powell's own affidavit and that of another preparer, Shanyce Broadnax, who supports Defendants' position that any fraud was limited to the work of a few bad apples—namely Brandy Hawkins herself.

This case is thus rife with questions of credibility and contradictions in the witnesses' versions of the facts. Such a dispute is not properly resolved on summary judgment. Cases cited by the Government that are most analogous to this one—where witness testimony supported the Government's theory that tax preparers habitually engaged in the same patterns of fraudulent conduct—were resolved at trial.[17] The Government also cites cases where courts granted preliminary injunctions, which are assessed under a different standard. In those cases—unlike this one—injunctions were proper because the defendants adopted meritless positions on questions of tax law, or the courts were able to rely on witness testimony presented at hearings.[18]

---

[17] See United States v. ITS Fin., LLC, 592 F. App'x 387, 389 (6th Cir. 2014) (affirming issuance of § 7402(a) injunction following nine-day bench trial); Stinson, 239 F. Supp. 3d 1299; United States v. Musin, 953 F. Supp. 2d 944, 946, 969 (S.D. Iowa 2011) (entering permanent injunction under § 7407 where business engaged in "wholesale pattern of taking deductions without justification"); Baxter, 372 F. Supp. 2d 1326.

[18] See United States v. Sang, No. 21-4266, 2022 WL 581012, *12 (E.D.N.Y. Feb. 26, 2022) (granting preliminary injunction under 26 U.S.C. §§ 7407 and 7402 where only one of multiple tax preparers opposed injunction, where court rejected defendant's position that "customer declarations" were "inadmissible hearsay," and where Government proffered tax returns making improper claims that listed defendant as preparer with her unique PTIN); United States v. Gray, No. 107-cv-42, 2007 WL 851873, at *3 (W.D. Mich. Mar. 19, 2007) (entering preliminary

The Government further cites cases where courts granted permanent § 7407 injunctions at the summary-judgment stage, but those cases did not revolve around questions of witness credibility like this one does.  In some of those cases, all material facts were established by a criminal record in a parallel case.[19]  In others, it was uncontroverted that defendants relied on

---

injunction under § 7407 where defendant took position that his customers had no income or that their wages were not taxable, despite defendant's knowledge that this position had "been clearly rejected by the courts"); United States v. Franchi, 756 F. Supp. 889, 893 (W.D. Pa. 1991) (ordering preliminary injunction under § 7407 following hearing at which "[m]any witnesses also came forward during the four days of testimony to say that [defendant] had engaged in fraudulent and deceptive conduct in preparing their returns"); United States v. Venie, 691 F. Supp. 834, 835–838 (M.D. Pa. 1988) (granting Government's motion for preliminary injunction following hearing at which "the government offered the testimony of several taxpayers whose tax returns had been prepared by" defendant, affidavits of additional taxpayers, and testimony of special agent who had engaged defendant's services in undercover capacity, and rejecting pro se defendant's position that each member of married couple could claim "Head of Household" status).

[19] See United States v. Hinz, 126 F. Supp. 3d 921, 929 (N.D. Ohio 2015) (granting Government's motion for summary judgment and entering permanent injunction under §§ 7402(a) and 7407 where defendant's plea to criminal charges meant he was "estopped from denying the undisputed facts that show he abused the federal income tax laws"); United States v. Gibson, No. 08-14700, 2010 WL 1139340, at *2 (E.D. Mich. Mar. 24, 2010) (granting Government's motion for summary judgment and entering permanent injunction under § 7402(a) and § 7407 where defendant had entered plea agreement in criminal case admitting to having prepared false income tax returns).

untenable legal positions.[20]  In several of these cases, defendants failed to put forward evidence sufficient to rebut the evidence presented by the Government's witnesses.[21]

In this case, the Government's witnesses swear to one version of facts, and Defendants' witnesses swear to another.  Genuine issues of material fact pervade the question of whether

---

[20] See Elsass, 978 F. Supp. 2d at 914–931 (granting in part motion for summary judgment and entering permanent injunction under §§ 7402 and 7407 where there was no material factual dispute that defendant attorney's claimed theft-loss deductions were improper because (i) the losses were not criminal in nature, (ii) losses were claimed prematurely before they were ascertainable with reasonable certainty, (iii) losses were claimed by people not entitled to claim them, and (iv) it was "undisputed" that defendant used incorrect forms to inflate refunds); United States v. Pugh, 717 F. Supp. 2d 271, 275–782 (E.D.N.Y. 2010) (granting motion for summary judgment and ordering permanent injunction under §§ 7402(a) and 7407 where defendant relied on "frivolous" "claim of right" doctrine—asserting that individuals and their income are not subject to federal income tax—and where Government submitted "unrebutted evidence" that defendant maintained this position after IRS issued warnings that position lacked merit).

[21] See United States v. Harris, No. 5:18-cv-539, 2020 WL 1431525, at *1, *4 (M.D. Fla. Jan. 29, 2020), report and recommendation adopted, No. 5:18-cv-539, 2020 WL 755392 (M.D. Fla. Feb. 14, 2020) (granting Government's motion for summary judgment and entering permanent injunction under §§ 7402(a) and 7407 where Government "presented substantial—and wholly unrefuted—evidence showing a widespread pattern of highly inaccurate returns" at defendants' tax preparation businesses, noting that defendants "failed to provide any evidence to rebut the evidence submitted by the United States"); United States v. Pope, No. 15-11224, 2017 WL 5971665, at *1, *6–*7 (E.D. Mich. Nov. 30, 2017) (granting Government's motion for summary judgment and entering permanent injunction under §§ 7407 and 7402 where defendants "refused to respond to any substantive discovery by the government about their conduct or to furnish any affidavits or declarations in response to the motion" and had "not pointed to any information in the record to rebut the declarations" of the Government's witnesses); Sonibare, 504 F. Supp. 2d 566 at 569, 572 (granting summary judgment where the "Government's allegations were largely undisputed," where the court deemed "admitted" matters on which defendant failed to answer the Government's discovery requests, and where the Government's claim that defendant misrepresented himself as a certified public accountant (CPA) was "undisputed"); Brockhouse v. United States, 749 F.2d 1248, 1251–1253 (7th Cir. 1984) (affirming grant of summary judgment on finding that CPA violated § 6694(a) where record evidence established that CPA had failed to report client's income from interest on loan to corporation, though documentation showed CPA knew that client had made loan to corporation and that corporation had reported income expense); see also United States v. Ott, No. 18-cv-12174, 2019 WL 3714491, at *2 (E.D. Mich. Aug. 7, 2019) (granting motion for partial summary judgment on claim that taxpayer violated 31 U.S.C. § 5314 when she failed to disclose two foreign financial accounts she knew she owned and never "took any steps to learn whether she was required to report" them).

Defendants fraudulently misrepresented Schedule C expenses and HSH statuses and thus understated liability in violation of §§ 6694(a) and (b).  The Court denies the Government's motion for summary judgment on this count.

### 2.  Section 6695(g): EITC Due Diligence

Title 26 U.S.C. § 6695(g) makes it a violation to "fail[] to comply with due diligence requirements imposed by the Secretary by regulations with respect to determining" (i) "eligibility to file as a head of household" or (ii) "eligibility for, or the amount of, the credit allowable" for the EITC.  26 U.S.C. § 6695(g)(1), (2).  As both the Government and Defendants note, under these regulations:

> A practitioner advising a client to take a position on a tax return, . . . or preparing or signing a tax return as a preparer, generally may rely in good faith without verification upon information furnished by the client.  The practitioner may not, however, ignore the implications of information furnished to, or actually known by, the practitioner, and must make reasonable inquiries if the information as furnished appears to be incorrect, inconsistent with an important fact or another factual assumption, or incomplete.

31 C.F.R. § 10.34(d).[22]

The Government argues that Defendants failed to exercise due diligence because "[i]t is inherently impossible to conduct proper due diligence while fabricating claims and amounts on a tax return."  Br. in Supp. Mot. at 42 (citing Stinson, 239 F. Supp. 3d at 1320); see also Br. in Supp. Mot. at 28–29, 29 n. 125.  As discussed, however, there are issues of material fact on the question of whether Defendants have fabricated claims.

---

[22] See also 26 C.F.R. § 1.6694-1(e)(1) ("The tax return preparer must make reasonable inquiries if the information as furnished appears to be incorrect or incomplete."); 26 C.F.R. § 1.6695-2(b)(3) ("The tax return preparer . . . must make reasonable inquiries" if he or she would reasonably conclude "that the information furnished to the tax return preparer appears to be incorrect, inconsistent, or incomplete.").

The Government also argues that, on two occasions, "preparers employed by The Tax Experts [were] penalized tens of thousands of dollars for failing to comply with the IRS's due diligence requirements for returns that claim the EITC," but neither preparer suffered adverse employment consequences. Id. The Government here refers to the IRS investigation into The Tax Experts in October 2014 and its assessment of penalties against preparers Aurora Garcia and Jasmine Powell in 2015 for failure to use due diligence. Id. at 34–36.

However, the failure of individual preparers to use due diligence before 2015 does not eliminate all material factual dispute on the question of whether Powell and her tax preparation companies failed to use due diligence in the period alleged by the Government: 2019–2021. And according to Defendants, they properly responded to this incident by conducting an internal investigation and taking corrective action. Br. in Supp. Resp. at 41–43. Summary judgment is not appropriate on this Government theory.

The Government next submits that Powell testified that "Schedule C businesses with large losses are 'not logical,'" which the Government argues establishes a due diligence violation because Powell "also testified that it was not the policy at her The Tax Experts locations for the preparers to ask follow-up questions and [her preparers] did not request to see any documentation from the customers other than the responses to the preprinted forms." Reply at 24. In fact, Powell testified that if a position claimed by a customer was "not logical," then she directed her preparers to "get receipts" or "ask more questions." Powell Dep. at 142, 192, 246. Powell acknowledged that she "took [the customers'] word for it" when the customers' positions did not "look illogical," id. at 192, but this position is not a violation of tax law on its face; preparers can generally rely in good faith on customers' submissions, 31 C.F.R. § 10.34(d). And as the Government notes, Powell's preparers did aver that they asked customers' follow-up questions. See, e.g., Adams Aff.

18

¶ 32 ("It was my practice to ask taxpayers if they had documents to support the information they were providing on their written questionnaire.").

The Government takes issue with the substance of the preparers' questions and submits that further documentation would have been appropriate to substantiate thousands of dollars of claimed expenses and self-serving assertions about HSH statuses. See Reply at 23–26. The Government may ultimately be correct. But the case cited by the Government in support of its due diligence argument does not require a grant of summary judgment here. See id. at 26 (citing Brockhouse, 749 F.2d at 1251). Brockhouse featured a single, blatant example of a preparer indisputably refusing to connect dots between reported information and an obvious omission. 749 F.2d at 1252 (finding § 9994(a) violation where preparer did not report interest income for client though preparer was "aware that [client] had made loans to the corporation and that the corporation had made interest payments"). In the case before this Court, the preparers and customers fundamentally disagree and contradict each other on what information was presented to the preparers and where that information originated. Thus, the factual record remains disputed on whether Defendants properly relied in good faith on customer representations, or whether they were aware of warning signs that should have prompted additional investigation. See 31 C.F.R. § 10.34(d). The Court denies summary judgment on this theory.[23]

---

[23] The Government also argues: "The Household Help forms on which The Tax Experts purport to rely in preparing the returns reflect that each customer had multiple employers who paid them at or below the threshold amount for employers to withhold income and to pay FICA taxes." Reply at 23–24 (citing Gov't SOMF ¶ 52). The Government sees this fact as a "red flag[]" that should have prompted preparers to "request support for this claim." Id. at 24.

The cited paragraph of the Government's motion provides a table of reported HSH income which the Government asserts is "fraudulent or mischaracterized." Gov't SOMF ¶ 52. However, the specific argument that customers' HSH claims for multiple employers should have raised suspicion and prompted additional investigation is absent from the Government's motion. Id. ¶ 53. As an argument presented for the first time in a reply, this argument is waived. See Scottsdale

### 3.  Section 7407(b)(1)(D): Substantial Interference

Section 7407(b)(1)(D) allows for an injunction where a tax return preparer has "engaged in any other fraudulent or deceptive conduct which substantially interferes with the proper administration of the Internal Revenue laws."  § 7407(b)(1)(D).  The Government submits that Defendants' customers are "not reporting their correct tax liabilities, not paying taxes that they may owe . . . [and] receiving refunds in amounts to which they are not entitled," which constitute "widespread, deceptive conduct" meriting injunctive relief.  Br. in Supp. Mot. at 42–43.

As discussed, genuine issues of material fact pervade the question of whether Defendants were responsible for any incorrect representations in their customers' returns.  The Court denies summary judgment on this theory.

Because genuine issues of material fact prevent this Court from finding that Defendants "continually or repeatedly engaged in" conduct prohibited under § 7407(b)(1)(A)–(D), the Court denies the Government's motion for a permanent injunction under § 7407.[24]

---

Ins. Co. v. Flowers, 513 F.3d 546, 553 (6th Cir. 2008).  Regardless, even if the Court were to consider the question of whether preparers properly relied on their customers' representations on HSH or failed to conduct necessary follow-up, summary judgment is not proper; depending on the factual circumstances of what information was presented to preparers (and whether the preparers or customers are misrepresenting what occurred in their meetings), Defendants may have done all that the law required.

[24] Relying on its allegations relating to claims about Schedule C and HSH, the Government does not explicitly support its § 7407 argument with reference to its allegations that Defendants (i) improperly claimed "Head of Household" statuses and (ii) misrepresented tax preparers' PTINs. Regardless, these theories also rely on conflicting witness testimony, and so are also not proper grounds for summary judgment.

The Court does not reach the question of whether an "injunction prohibiting such conduct would not be sufficient to prevent [Defendants'] interference" with the internal revenue laws.  The Court, therefore, does not consider additional examples of Defendants' misconduct alleged by the Government, like Defendants' supposedly improper obtainment of a new Electronic Filing Identification Number (EFIN) after the IRS expelled Defendants from the EFIN program.  Br. in Supp. Mot. at 37; Reply at 19–20.  This assertion is not presented as a basis for finding that Defendants engaged in prohibited § 7407(b) conduct, and so the Court views it as additional

### B.  Permanent Injunction and Disgorgement Under § 7402(a)

Section 7402(a) grants district courts broad authority to issue injunctions "as may be necessary or appropriate for the enforcement of the internal revenue laws."  26 U.S.C. § 7402(a).  The authority provided under § 7402(a) is "in addition to and not exclusive of any and all other remedies" available to enforce the internal revenue laws.  Id.  "It is sufficient under § 7402 for the Government to prove a pattern of gross negligence or recklessness, so long as injunctive relief is necessary or appropriate for the enforcement of the internal revenue laws."  Stinson, 239 F. Supp. 3d at 1324–1325 (punctuation modified).

The Government submits that understating tax liability constitutes substantial interference with the internal revenue laws.  See Br. in Supp. Mot. at 48.  In its view, a § 7402 injunction is warranted because "Defendants have engaged in a long-standing pattern of understating their customers' tax liabilities in order to obtain undeserved refunds for their customers," resulting in "irreparable harm includ[ing] the loss of millions of dollars to the Treasury, fraud against the Defendants' customers, injury to law-abiding tax return preparers who lose customers to the Defendants, and undermining public confidence in the tax law."  Id. at 49–50.

As this Court has explained, the Government's theory that Defendants systematically misrepresented their customers' tax liabilities relies on factual allegations that are in material dispute.  The Government's authorities for their § 7402 position are the same cases that the Court has discussed and found non-supportive of summary judgment in the § 7407 context.  See Hinz, 126 F. Supp. 3d at 930; Pugh, 717 F. Supp. 2d at 299–300; Franchi, 756 F. Supp. at 893.  The

---

context provided by the Government on the issue of whether a permanent injunction is warranted—which the Court does not reach.  Nor does the Court consider Defendants' arguments that their last existing tax preparation business—Speedy Tax Stores Corporation—has cured the alleged ills that infected Powell's previous businesses, which in Defendants' view indicates that a permanent injunction is improper.  See Br. in Supp. Resp. at 15–16, 31.

Court denies the Government's motion for summary judgment under § 7402, and it does not reach the Government's argument on the appropriateness of a disgorgement remedy.

### III.  CONCLUSION

For the reasons explained above, the Court denies the Government's motion for summary judgment (Dkt. 56) and denies Defendants' motion for oral argument (Dkt. 104).

SO ORDERED.

Dated:  June 22, 2023                                        s/Mark A. Goldsmith
    Detroit, Michigan                              MARK A. GOLDSMITH
                                             United States District Judge