UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,                         Case No. 21-cv-10622

v.                                         HON. MARK A. GOLDSMITH

ANNETTA POWELL et al.,

               Defendants.

_____/

## OPINION & ORDER
## CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING
## BENCH TRIAL

### I.    INTRODUCTION

This is a tax fraud case in which the Government contends that Defendant Annetta Powell—who owned and operated as many as five tax preparation stores in the Detroit area from 2009–2021—ran a tax fraud enterprise, training her preparers to file fraudulent tax returns on behalf of customers to generate inflated refunds from which Powell's businesses were paid. Powell admits that her businesses engaged in some degree of fraudulent activity but maintains that she acted in good faith and any fraudulent information reported on tax returns was provided to her preparers by customers directly. Further, Powell argues that she took appropriate measures to bring her tax preparation businesses into compliance as soon as she became aware of any issues.

The Government seeks to (i) permanently enjoin Powell and seven of her tax preparation entities (Defendants) from acting as tax return preparers and (ii) disgorge from Defendants

1

$689,797.91, which represents an approximation of the net profits they received for fraudulent return preparation between 2019 and 2021.[1]

The Court conducted a 12-day bench trial between November 14, 2023, and January 9, 2024.  The parties have submitted post-trial briefs and proposed findings of fact and conclusions of law, as well as responses to the post-trial briefing.[2]  Considering all the evidence, the Court finds in favor of the Government and permanently enjoins Powell and her tax preparation businesses from acting as tax return preparers.  The Court also orders Defendants to disgorge $689,797.91 to the Government.

## II.    BACKGROUND

Powell opened her first two tax preparation locations in 2009 and began filing returns for the 2010 tax preparation season.  Stipulation of Facts (SOF) ¶¶ 3, 4 (Dkt. 146).  Between 2009 and 2021, Powell operated five tax preparation stores in the greater Detroit area.[3]  Powell's businesses operated under the trade name "The Tax Experts" and used the tax preparation software of "The Tax Experts, Inc.," a corporation separately owned by Jeanisia Allen.[4]  Id. ¶ 4.  Powell paid Jeanisia

---

[1] The Defendants include Annetta Powell; Alliance Tax Services, Inc.; Nationwide Tax Services, Inc.; Tax Expert Stores, Inc.; United Tax Services, Inc.; Top Financial Specialists, Inc. d/b/a The Tax Experts; United Financial Team Corp. d/b/a/ The Tax Experts; and Speedy Tax Stores Corporation.

[2] The briefing includes the Government's proposed findings of fact and conclusions of law (PFFCL) (Dkt. 166), the Defendants' PFFCL (Dkt. 167), the Government's response (Dkt. 168), and the Defendants' response (Dkt. 169).  The parties also submitted a stipulation of facts (SOF) before the trial began (Dkt. 146).

[3] Powell's store locations included: (i) 19232 Joy Rd., Detroit, MI 48228 (the "Joy Road" location, opened in 2009); (ii) 4213 East 7 Mile Rd., Detroit, MI 48234 (the "7 Mile" location, opened in 2009); (iii) 19954 Conant St., Detroit, MI 48234 (the "Conant" location, opened in 2012); (iv) 61 West Huron St., Pontiac, MI 48342 (the "Pontiac" location, opened in 2014); and (v) 3110 S. Dort Highway, Flint, MI (the "Flint" location, opened in 2017).  See SOF (Dkt. 146) ¶¶ 3, 6, 7, 12.

[4] In United States of America v. Allen et al., No. 21-cv-10620 (E.D. Mich.), the Government brought claims against Jeanisia Allen and several of her businesses that were similar to the claims

Allen a franchise fee for each store location and a service fee for every return prepared using Jeanisia Allen's software. Id.

Powell operated her stores through seven corporations, which are no longer in business.[5] Powell's only tax preparation business still in operation is Speedy Tax Stores Corporation, which was incorporated in 2021 after The Tax Experts, Inc. ceased operations. Id. ¶ 15. Speedy Tax Stores Corporation operated the Pontiac, 7 Mile, Conant, Joy Road, and Flint locations for the 2022 tax preparation season. Id. ¶ 16.

Powell had no formal training in tax law or tax preparation when she opened The Tax Experts store locations. Id. ¶ 36. Her only training was provided by an employee of Jeanisia Allen in 2009. Id. Powell herself did not prepare any tax returns at The Tax Experts. Id. ¶ 37. Instead, she hired store managers who hired and oversaw return preparers. Id. Powell's employees were given the same training Powell received, first led by Carol Allen, the manager of Powell's Joy Road location until 2016, and then by other store managers. Id. ¶ 36.

The IRS first shared its concerns regarding practices at The Tax Experts with Powell in 2014, when IRS agents visited the 7 Mile and Pontiac locations as part of earned income tax credit (EITC) due diligence investigations.[6] Id. ¶¶ 73–74. The investigations concerned two preparers,

---

it asserts here against Powell and Powell's businesses. Allen has been resolved; Jeanisia Allen agreed to an injunction on her provision of tax preparation services, see 5/13/22 Stipulated O. and J. (No. 21-cv-10620, Dkt. 45), and the Government agreed to dismiss its demand for disgorgement, see 4/14/23 Stipulated O. (No. 21-cv-10620, Dkt. 62). To distinguish between Jeanisia Allen and Carol Allen, the manager of Powell's Joy Road location until 2016, the Court refers to both individuals by their full names.

[5] Powell's now-defunct corporations included Alliance Tax Services; Nationwide Tax Services; Tax Experts Stores, Inc.; United Tax Services, Inc.; Top Financial Specialists, Inc., United Financial Team Corporation; and Tax Experts Team, Inc. SOF ¶¶ 5, 6, 8, 10, 11, 13, 14. Each corporation is a Defendant in the present case except for Tax Experts Team, Inc.

[6] The EITC is a refundable tax credit available to low-income workers. SOF ¶ 52. The amount of the EITC a taxpayer receives depends on their income, filing status, and number of qualifying

Aurora Garcia and Jasmine Powell (Annetta Powell's sister).[7]  Id.  The IRS was concerned because Garcia was filing returns claiming the EITC without retaining documentation; Jasmine Powell was filing returns claiming the EITC that improperly listed both Schedule C income and household help income for the same activities.[8]  Id.  During the EITC due diligence investigation, IRS agents spoke directly with Powell regarding both preparers, and Powell provided assurances that she would take steps to resolve both issues.  Id.  In 2015, the IRS assessed penalties of $103,500 against Garcia and $21,000 against Jasmine Powell for failure to use due diligence when preparing returns claiming the EITC.  Id.  Both Garcia and Jasmine Powell continued working at The Tax Experts after the penalties were assessed.  Id.

Based on the EITC due diligence investigations, the IRS authorized an investigation of Powell's stores in January 2016.  Trial Tr. V.1 at 32 (Dkt. 154).  Powell was first informed that the IRS was investigating her and her businesses at some point in 2016 when she was contacted by Rachel Nelson, the IRS agent leading the investigation.  Trial Tr. V.9 at 102 (Dkt. 160).  The

---

dependents.  Id.  For a worker with nonzero income, the amount of the EITC the worker qualifies for increases gradually with income until the maximum credit is reached, and then gradually decreases until the taxpayer's income surpasses a certain point beyond which a taxpayer is not eligible to claim the EITC.  For example, in 2020, single taxpayers with one qualifying dependent and income between $10,500 and $19,350 qualified for the maximum EITC amount of $3,584.  Id. ¶ 57.  Taxpayers with income slightly below $10,500 or slightly above $19,230 still qualified for the EITC but received a smaller amount.  Taxpayers with zero income or income above $41,756 did not qualify for the EITC.

[7] To distinguish between Annetta Powell and Jasmine Powell, the Court refers to Jasmine Powell by her full name.  The Court refers to Annetta Powell as Powell.

[8] Schedule C is the form on which a self-employed taxpayer reports income and expenses.  SOF. SOF ¶ 58.  Household help (HSH) income is paid to individuals performing household work who are considered employees of the person for whom they perform the household work.  Id. ¶ 62. Workers are considered employees if their employer determines and controls their work.  Id. Workers are considered sole proprietors or independent contractors rather than employees if they provide their own supplies and offer their services to the general public.  Id. ¶ 63.

parties dispute the various communications and actions that occurred after 2016. The Government argues that Powell actively frustrated the IRS's investigation and lied to Agent Nelson on multiple occasions. See Pl. Br. Supp. PFFCL at 15. Defendants deny these allegations and contend that Powell worked to bring her stores into compliance as soon as she was aware of the specific concerns of the IRS. See Def. Br. Supp. PFFCL at 6.

The present lawsuit was filed in March 2021 and is based, in part, on similar fraudulent conduct explored in the earlier investigations. At a high level, the Government alleges that Defendants purposefully included false information on customer returns to maximize customer refunds and store preparation fees. Specifically, the Government alleges that Powell's preparers repeatedly claimed the following on customer returns: (i) fictitious or mischaracterized household help (HSH) income; (ii) fake Schedule C losses; (iii) false and inflated education expenses for the American opportunity credit (AOC);[9] and (iv) improper head of household (HoH) filing status.[10] See Pl. Br. Supp. PFFCL at 13.

The Government seeks a permanent injunction under 26 U.S.C. §§ 7407 and 7402(a) barring Defendants from preparing tax returns for others.[11] The Court begins by addressing both grounds in turn and then considers whether disgorgement of Defendants' net profits pursuant to § 7402(a) is an appropriate remedy. The Court concludes by addressing the evidentiary objections

---

[9] The AOC is a tax credit available to taxpayers who pay "qualified education expenses" towards the higher education of an eligible student, including themselves. SOF ¶ 64. Qualified education expenses are reported by educational institutions on Form 1098-T. Id.

[10] HoH filing status can only be claimed if (i) the taxpayer is unmarried or considered unmarried at the end of the year, (ii) the taxpayer paid more than half the cost of keeping up a home, and (iii) qualifying dependents lived in the home for more than half of the year. See SOF ¶ 61; 26 U.S.C. § 2(b).

[11] Defendants have been temporarily enjoined from preparing tax returns since February 2023, pending the outcome of this case. See 2/16/23 Agreed Order (Dkt. 80); 1/16/24 Agreed Order.

raised by both parties. Ultimately, the Court finds that both a permanent injunction and disgorgement are warranted.

### III.   ANALYSIS

#### A.  Permanent Injunction Under § 7407

To obtain an injunction under 26 U.S.C. § 7407 prohibiting Defendants from acting as tax preparers, the Government must show:

(i)   Defendants are "income tax preparers" within the meaning of 26 U.S.C. § 7701(a)(36);

(ii)  Defendants "continually or repeatedly engaged in" conduct specifically prohibited under 26 U.S.C. § 7407(b)(1)(A)–(D); and

(iii) an "injunction prohibiting such conduct would not be sufficient to prevent such person's interference" with the internal revenue laws.

United States v. Elsass, 978 F. Supp. 2d 901, 909, 938 (S.D. Ohio 2013), aff'd. 769 F.3d 390 (6th Cir. 2014) (quoting § 7407(b)).  The parties do not dispute that Defendants are income tax preparers within the meaning of § 7701(a)(36).  See Joint Final Pretrial Order (JFPO) at 2–3 (Dkt. 174).  The Court, therefore, considers only the second and third factors.

#### 1.  Prohibited Conduct

The Government alleges that Defendants engaged in conduct prohibited by 26 U.S.C. § 7407(b)(1)(A) and (D).  Pl. Br. Supp. PFFCL at 4–12.  Section 7407(b)(1)(A) allows an injunction against a tax return preparer who has "engaged in any conduct subject to penalty under section 6694 or 6695."  The Government contends that Powell has engaged in conduct subject to penalty under 26 U.S.C. § 6694(a), (b) and § 6695(g).  Id.

Section 6694(a) makes it a violation for a tax preparer to take an "unreasonable position" on a taxpayer's return that results in an "understatement of liability" if the preparer "knew (or reasonably should have known) of the position."  An "unreasonable position" is one for which there was not "substantial authority."  26 U.S.C. § 6694(a)(2)(A).  This can include the negligent

failure of a preparer to inquire into information provided by a customer.  See Brockhouse v. United States, 749 F.2d 1248, 1251 (7th Cir. 1984).  An exception to § 6694(a) applies if it can be shown that there was reasonable cause for the understatement and the tax return preparer acted in good faith.  26 U.S.C. § 6694(a)(3).

Section 6694(b) makes it a violation for a preparer to "willful[ly] attempt" to understate a taxpayer's liability or to exhibit "a reckless or intentional disregard of rules or regulations." Examples of willful or reckless disregard of rules or regulations include falsifying deductions.  See United States v. Simmons, No. 22-cv-11916, 2023 WL 2873358, at *4 (E.D. Mich. Apr. 10, 2023). Under both § 6694(a) and (b), an "understatement of liability" can occur either by underestimating the amount of taxes owed or by overstating the amount of credit or refund due to the taxpayer.  26 U.S.C. § 6694(e).

Section 6695(g) makes it a violation to fail to comply with IRS due diligence requirements with respect to determining a taxpayer's: (i) eligibility to file as head of household; (ii) claim for the EITC and the amount of such claim; and (iii) claim of the AOC and the amount of such claim. See 26 U.S.C. § § 6694(e), 25A, 32.

The Government argues that Defendants engaged in conduct subject to penalty under § 6694(a) and (b) by filing returns claiming fictitious or mischaracterized HSH income and/or fake Schedule C losses.  Pl. Br. Supp. PFFCL at 6.  For returns that claimed the EITC based on these false figures, the Government contends that Defendants also violated § 6695(g).  Id.  Under the Government's theory, for customers whose income was below the maximum range for the EITC, preparers would report false HSH and/or Schedule C income to raise the customer's earned income into a range that yielded a higher EITC.  Pl. Br. Supp. PFFCL at 2–3.  For customers with incomes above the EITC range, preparers would fabricate Schedule C expenses to offset W-2 income and

bring the customer's income into the range eligible for the ETIC.  Id.  In addition to EITC-related violations, the Government submits that Defendants violated § 6695(g) by preparing returns that fraudulently claimed the AOC and HoH status.

In the sections that follow, the Court discusses the evidence supporting each type of alleged violation.

### a. Household Help Income

The Government contends that Defendants prepared returns claiming HSH income even when they knew the customer did not meet the definition of a HSH employee.  Pl. SOF ¶ 42.  They argue that Defendants did so strategically because HSH employees are not required to pay self-employment taxes and no withholding would have been required at the employer level as long as the amount of income reported from any given employer was below a certain threshold.  Id. ¶ 43.

The testimony of Brandy Hawkins—the manager of Powell's Flint store—corroborates the Government's theory.[12]  At trial, Brandy Hawkins explained that preparers were trained to strongly suggest to customers that they could qualify for a larger EITC amount if they reported additional income.  Trial Tr. V.4 at 19 (Dkt. 157).  She explained that preparers were trained to fill out the HSH form for customers who were "dissatisfied" with their returns as long as they kept the amount

---

[12] Defendants argue that Hawkins is not a credible witness because she was fired by The Tax Experts and has allegedly "vowed to get even" with Powell.  Def. Br. Supp. PFFCL at 9–10. Defendants also attempt to impeach Hawkins as a witness by pointing to supposedly incorrect and contradictory statements made by Hawkins.  Id.  At trial, Hawkins testified that she has no animosity toward Powell.  Trial Tr. V.4 at 115–116 (Dkt. 157).  Notwithstanding Defendants' impeachment arguments, the Court credits her testimony because it comports with patterns exhibited in the returns and the testimony of numerous customers.

To distinguish between Brandy Hawkins, the manager of Powell's Flint store, and Waekelia Hawkins, a customer whose 2020 tax return was prepared by Defendants, the Court refers to Brandy Hawkins by Hawkins and Waekelia Hawkins by her full name.

under $2,000, which she referred to as "the threshold for household help per household." Id. at 17–18. Preparers were not instructed to verify that the income was real. Id. at 18.

The returns and testimony of multiple customers further corroborate the Government's theory. For example, Lula Johnson testified that her returns prepared by The Tax Experts claimed false HSH income. Trial Tr. at 168–169 (Dkt. 152). [13] True, Johnson's testimony was hard to follow; she first testified that her only income in 2016–2018 was from babysitting her granddaughter and that she made somewhere between $7,800 and $10,400 each year. Id. at 160–163, 173. But Johnson later testified that she had no grandchildren in 2018 and earned money from doing hair, not from babysitting. Id. at 183. Regardless, Johnson consistently testified that she never performed housekeeping work and that she always made less than the amount reported on her returns. Id. at 166, 174, 194

Despite never working in housekeeping, the HSH form Johnson filled out for The Tax Experts in 2016 listed her occupation as "housekeeping" with total HSH income of $16,578. Joint Ex. 162 (Johnson 2016 File) at JE15681–JE15682. The form lists eleven employers that Johnson supposedly worked for as a housekeeper, claiming less than $2,000 in income from each employer. Id. Johnson explained that The Tax Experts told her to write random employer names on the form and said that she could list or make up whatever names she wanted. Trial Tr. at 167–168 (Dkt. 152). The Tax Experts told Johnson she would get a "better tax refund" if she wrote down the numbers they gave her. Id. at 188. Johnson testified that The Tax Experts similarly told her what to write on her HSH forms in later years, including a fictitious childcare company with large expenses in 2019. Id. at 187–88, 195–96, 200–201.

---

[13] The trial transcript docketed as Dkt. 152 does not bear a volume number.

The Court acknowledges that Johnson's testimony was contradictory at times but finds it to be credible regarding the issue of HSH income.  On the taxpayer application Johnson filled out for The Tax Experts in 2016, Johnson first circled "no" for whether she received HSH income, but then crossed out "no" and circled "yes."   Joint Ex. 162 (Johnson 2016 File) at JE15677.  This supports the finding that The Tax Exports told Johnson she should report falsified HSH income if she wanted a larger return; it is not plausible that Johnson, with little knowledge of tax law, thought of the scheme herself, without any suggestion from Defendants.  Further, Johnson was one of many customers who testified similarly regarding falsified HSH income.[14]

### b.  Schedule C

The evidence also supports the conclusion that Defendants prepared returns reporting fake Schedule C businesses and/or business expenses.  Hawkins testified that preparers were trained to change customers' Schedule C forms to "put in the amount that would get [the customer] the most money back."  Trial Tr. V.4 at 31.  She detailed how this was done by adding fake businesses if the customer had income below the maximum EITC range or adding fake business expenses if the customer had income above the maximum EITC range.  Id.  at 31–33.  According to Hawkins, the

---

[14] Other customers who testified regarding fraudulent HSH income include Kim Rowland and Lorie Thomas.  Rowland testified that she was a housekeeper during some of the years The Tax Experts prepared her returns, but she didn't recognize any of the names listed as employers on her HSH form.  Trial Tr. V.2 at 45–46 (Dkt. 155).  She testified that The Tax Experts came up with the amount of income listed for each employer.  Id. at 46.  It is unlikely that Rowland met the statutory definition of a HSH employee because she purchased her own supplies and had control over her schedule.  Id. at 53–55.  Rowland claimed the EITC based on her fraudulently reported income each year.  See, e.g., Joint Ex. 135 (Rowland 2016 Return) at JE14486.

Lorie Thomas testified that her 2019 income as shown on her return prepared by The Tax Experts overstated her income by at least $9,000.  Trial Tr. V.2 at 126–127.  She did not recognize the names listed on her HSH form for that year, and she was not sure why the form listed her job title as housekeeper.  Id. at 127–129.  Thomas had only worked as an assembly line worker and in childcare during 2019.  Id. at 118.  As with Rowland, Thomas also claimed the EITC based on her fraudulently reported income.  See, e.g., Joint Ex. 83 (Thomas 2019 Return) at JE12239.

preparer came up with the numbers to report but the customer wrote them on the form.  Id. at 32.

Hawkins explained that customers were told to list at least five clients on the self-employed client

form provided by The Tax Experts, but they could make up random names.  Id. at 33.  Preparers

did not explain what the self-employment forms meant, and they often told customers what to put

on the due diligence form.  Id. at 34–36.

Multiple customers testified to filing returns claiming fake businesses or expenses.[15]  For

example, Izel Davis's 2016 return prepared by The Tax Experts reported an $8,636 loss for a

Schedule C business, which offset his W-2 income as a supervisor at a plastic company.  Joint Ex.

1 (Izel Davis 2016 Return) at JE10006; Trial Tr. V.3 at 103, 110 (Dkt. 156).  This reduced Davis's

W-2 income so that he could fraudulently claim the EITC.  Joint Ex. 1 (Izel Davis 2016 Return) at

JE10007.  The forms Davis filled out for the Tax Experts in 2016 list four clients for whom Davis

allegedly provided janitorial services.  Joint Ex. 2 (Izel Davis 2016 Customer File) at JE10029.

Davis testified that he never worked as a janitor, Trial Tr. V.3 at 110, but his preparer "told [him]

to say [he] had an extra business to get extra money," Id. at 106.  Davis admitted that he wrote

down the fake client names himself, but that his preparer told him what to write on the form.  Id.

at 107–110.  He said he was told to report fake businesses in 2017, 2018, and 2019 as well.  Id. at

115–129.  According to Davis, he returned to The Tax Experts each year not because he expected

them to accurately prepare his return, but because he "need[ed] the money."  Id. at 128.

### c.  American Opportunity Credit

The Government contends that Powell's preparers also violated § 6695(g) by failing to do

required due diligence for returns claiming the AOC.  Pl. Br. Supp. PFFCL at 7.  Customer

---

[15] Numerous other customers testified regarding fraudulent Schedule C businesses and/or expenses, including Monique Coakley, Trial Tr. V.1 at 175–182; Henry Hill, Trial Tr. V.3 at 63–67; Dwaine Carswell, Id. at 166–173, and others.

testimony supported this finding.  For example, Kim Roland testified that her 2017 tax return prepared by The Tax Experts fraudulently claimed the AOC.  Trial Tr. V.2 at 40–43 (Dkt. 155). Rowland was enrolled in school that year, but that she did not have out-of-pocket expenses because she had financial aid.  Id.  Nonetheless, her return listed $4,000 in qualified school education expenses and claimed the AOC.  Joint Ex. 137 (Rowland 2017 Return) at JE14578. Rowland did not know where the $4,000 number came from.  Trial Tr. V.2 at 41.

Customer Waekelia Hawkins's testimony regarding the claim of the AOC on her 2020 tax return was similar.  On her return, Waekelia Hawkins claimed the AOC on behalf of her daughter.  Joint Ex. 62 (Hawkins 2020 Return) at JE11518, JE11525–26.  But Waekelia Hawkins testified that she did not pay any money out of pocket for her daughter's schooling.  Hawkins Tr. at 63–64.  She was never asked to provide a 1098-T to her preparer.  Id. at 64.

### d.  Head of Household Status

The evidence from customers also shows that Defendants violated § 6695(g) by knowingly or recklessly filing returns claiming HoH status for customers who did not qualify, either because they were married or did not pay for more than half the cost of keeping up a home.  Derrick Norton's return claimed HoH status in 2016.  Joint Ex. 121 (Norton 2016 Return) at JE13889.  His HoH eligibility form prepared for The Tax Experts checked all three boxes required to claim HoH status (the boxes stated that he was unmarried or considered unmarried on the last day of the year, paid more than half the cost of keeping up a home for the year, and had a qualifying person living in the home with him for more than half the year).  Joint Ex. 122 (Norton 2016 File) at JE13913. Norton testified that he does not know who checked those boxes, but he is sure he would not have intended to claim HoH status.  Trial Tr. V.2 at 215–216.  He was living at his mother and stepfather's house at the time and did not qualify for HoH status.  Id. at 216.

Henry Lamont Hill's 2018 return claimed HoH status and his HoH eligibility form prepared for The Tax Experts shows a checked box saying he was unmarried or considered unmarried on the last day of 2018.  Joint Ex. 64 (Hill 2018 Return) at 11574; Joint Ex. 65 (Hill 2018 File) at JE11605.  Yet Hill testified that he was married on December 31, 2018, and that his preparer Sherry Neely personally knew he was married because Neely went to school with Hill's sister-in-law.  Trial Tr. V.3 at 60, 70.  Hill's testimony in particular shows that Defendants were likely reckless—if not intentional—in their disregard of rules or regulations.

### e.  Information Provided by the Taxpayer

As discussed above, Defendants prepared too many fraudulent returns with similar issues—whether it be EITC, HSH, Schedule C, AOC or HoH fraud—for the pattern to have been random.  Yet Defendants still try to argue that they are not responsible, largely by placing blame on their customers.  Defendants even contend that "Powell's stores were taken advantage of by their street-smart clients."  Def. Resp. to Pl. PFFCL at 8 (Dkt. 169).  But Defendants' attempts to blame their customers are without merit.

According to Defendants, "with rare exception, the sole source of the information used to prepare the tax returns in issue was supplied by the individual taxpayers in writing."  Def. Br. Supp. PFFCL at 7.  Defendants cite to the testimony of multiple preparers who testified that they never told customers what to put on forms.[16]  But this testimony contradicts the testimony of the numerous customers discussed above, who said they were told what to put on their tax return by

---

[16] See Trial Tr. V.10 at 26 (Dkt. 162) (Royana Rhimes answering "no" when asked if she "ever [told her] clients what they have to put on their forms"); Id. at 101 (Ajenae Bland testifying that she never "[told] a client to put a false number in any [] boxes"); Trial Tr. V.12 at 14 (Dkt. 165) (Lyncora Tart answering "no" when asked if she "ever [told] any client to put something on their tax return that was not true or correct").

their preparer.  The Court finds the testimony of the customers to be more credible than that of the preparers.  For one, it seems unlikely that many customers would be familiar enough with the tax code to prepare fraudulent returns of the nature described above.  Second, the Court found the testimony of the various preparers to be disingenuous.[17]

Even if the Court were to assume that taxpayers provided their preparers with fraudulent information, the preparers' reliance on the taxpayers' information was inappropriate.  Defendants repeatedly reference Treasury Circular 230, arguing that it allows a tax preparer to "rely on the information provided by the taxpayer in good faith without verification."  See, e.g., Def. SOF ¶¶ 16, 109; 31 C.F.R. § 10.34(d).[18]  But Treasury Circular 230 also states that "[t]he practitioner may not, however, ignore the implications of information furnished to, or actually known by, the practitioner, and must make reasonable inquiries if the information as furnished appears to be incorrect, inconsistent with an important fact or another factual assumption, or incomplete."  31 C.F.R. § 10.34(d).

Here, the evidence shows that Powell's preparers repeatedly failed to make reasonable inquires of their customers, even when customers reported suspicious numbers.  For example, Rhimes—a tax preparer for The Tax Experts from 2018–2022—testified that she did not ask any follow up questions when a customer reported $1,430 in income for a transportation business with an office expense of $3,800 and advertising expense of $2,900.  Trial Tr. V.10 at 50–57 (Dkt. 162).

---

[17] For example, the Court did not find the testimony of Rhimes discussed below to be credible. She refused to admit that certain numbers supposedly provided by a customer seemed suspicious, even when pressed on the subject.  See Trial Tr. V.10 at 50–57.

[18] The Secretary of the Treasury "publishes regulations governing practice before the IRS in the Code of Federal Regulations, Title 31, part 10."  Loving v. I.R.S., 917 F. Supp. 2d 67, 71 (D.D.C. 2013), aff'd, 742 F.3d 1013 (D.C. Cir. 2014).  "The Treasury reprints those regulations under the name Treasury Department Circular No. 230."  Id. (punctuation modified).

Rhimes wrote that the customer's work location was "on the road" but did not request any documentation or ask any questions regarding the office expense. Id. at 55. According to Rhimes, she was not required to check if the information provided by a customer was correct. Id. at 19–20. This was a clear violation of Treasury Circular 230.

In another attempt to place the blame on their customers, Defendants point to various customers who supposedly filed fraudulent taxes with other preparers after they stopped going to The Tax Experts. Def. Resp. to Pl. PFFCL at 8. They argue that such a pattern "leads any reasonable person to believe that the constant variable is the client not the preparer." Id. The Court does not find this argument persuasive. As already discussed, the testimony of numerous customers, as well as the pattern of fraudulent returns prepared by The Tax Experts, shows that the fraud was not entirely customer driven. The Court acknowledges that some taxpayers may have been complicit in the fraudulent preparation of their returns. But the issue before the Court is determining whether Defendants—not taxpayers—violated IRS rules and regulations.

In addition, Defendants argue that "[i]f the Court accepts the Government's arguments, it will establish a precedent that an individual will not have any responsibility for anything they sign under the penalty of perjury." Def. Br. Supp. PFFCL at 3. But the fact that customers often filled out and signed the various preparation forms themselves does not absolve Defendants from their legal responsibilities as tax return preparers. It is not surprising that taxpayers, when presented with the opportunity to receive a larger tax refund, with the encouragement of preparers at times, might violate rules and regulations. But taxpayers remain responsible for any of their own wrongdoings, and hundreds of Powell's customers have already been audited. Trial Tr. V.1 at 71. Holding Defendants responsible does not let taxpayers off the hook.

### f.  Substantial Interference

Section 7407(b)(1)(D) allows for an injunction where a tax return preparer has "engaged in any other fraudulent or deceptive conduct which substantially interferes with the proper administration of the Internal Revenue laws."  The Government submits that Defendants violated § 7407(b)(1)(D) by taking advantage of "uninformed" customers who were relying on The Tax Experts for professional help with their taxes.  Pl. Br. Supp. PFFCL at 7, 11–12.  The Court agrees.

As one example of Defendants' deceptive conduct, the Government points to Defendants promising low-income customers fake refund advances to get their business.  Id. at 11.  Powell openly admitted to this at trial, testifying that several locations of The Tax Experts advertised $9,500 refund advances when there was no way for customers to receive an advance that large.  Trial Tr. V.8 at 48–49 (Dkt. 153).  According to Powell, customers were told they could only get a $7,000 advance after entering the store.  Id. at 48.

The Government also argues that Defendants took wrongful advantage of their position of trust as preparers by having their customers sign fabricated substantiation forms.  Pl. Br. Supp. PFFCL at 11–12.  As discussed previously, the evidence shows that Defendants repeatedly told customers what fake numbers to put on substantiation forms to get the largest refund, and many customers signed the forms without knowing what they meant.  This is indeed a violation of trust.

Similar conduct has been found to constitute "other fraudulent or deceptive conduct."  In United States v. Stinson, 239 F. Supp. 3d 1299, 1303 (M.D. Fla. 2017), Defendants advertised "a specific refund per child and a tax refund that taxpayers would receive the same day."  The court found that "Stinson took advantage of his customers' general lack of any tax law knowledge, and their deference to his superior abilities such that they chose not to read through their tax returns. Stinson relied on his customers practice to simply sign their tax returns without reading them."  Id.

at 1320.  Defendants argue that <u>Stinson</u> is distinguishable, but the refund advance they advertised is not materially different from the deceptive same-day refund addressed in <u>Stinson</u>.  And even if Defendants promised "up to" a $9,500 refund advance, doing so fully knowing that there was no way for anyone to receive a $9,500 advance is deceptive.  Defendants' business model took advantage of taxpayers in the same way that taxpayers were exploited in <u>Stinson</u>, amounting to "fraudulent or deceptive conduct" in violation of § 7407(b)(1)(D).

Because it finds that Defendants continually or repeatedly engaged in conduct specifically prohibited under 26 U.S.C. § 7407(b)(1)(A)–(D), the Court next considers the appropriate remedy.

### 2.  Appropriate Scope of Injunction

Now that the Court has found that Defendants "continually or repeatedly engaged in" conduct subject to penalty under § 6694 and § 6695, the Court considers whether "injunctive relief is appropriate to prevent recurrence of such conduct."  Courts consider six factors in determining the need for an injunction:

> (1) the gravity of the harm caused by the offense; (2) the extent of the defendant's participation; (3) the defendant's degree of scienter; (4) the isolated or recurrent nature of the infraction; (5) the defendant's recognition (or non-recognition) of his own culpability; and (6) the likelihood that defendant's occupation would place him in a position where future violations could be anticipated.

<u>United States v. Gleason</u>, 432 F.3d 678, 683 (6th Cir. 2005) (punctuation modified).  Considering all evidence, the Court finds that all six factors weigh in favor of injunctive relief.

### a.  The Gravity of the Harm and the Recurrent Nature of the Infraction

The harm caused by Defendants' fraudulent tax preparation scheme was severe and widespread, occurring across five stores for nearly a decade.  As Agent Nelson explained, multiple people are harmed when a return is prepared fraudulently.  Trial Tr. V.1 at 70–71.  The taxpayer is harmed because, if they are audited, they will be liable for any unpaid taxes plus interest and penalties.  This can result in the taxpayer paying significantly more than they would have if their

return had been prepared correctly, not to mention the stress and psychological harm associated with being the subject of an audit.  The Government is also harmed when it is forced to pay fraudulent refunds and expend valuable resources investigating preparer fraud.  Further, everyone is harmed when the tax system is associated with a general lack of trust.

The evidence shows that these harms were present in this case.  The initial investigation conducted by the IRS showed that more than 90 percent of the 83 customers the IRS agent interviewed across all five of Powell's stores had returns prepared improperly.  Trial Tr. V.1 37, 48–49.  The tax returns for these 83 customers alone—who represent a small fraction of Defendants' total number of customers—were understated by roughly $250,000.[19]  Id.  Separately, roughly 750 customers who had returns prepared at Powell's stores have been audited by the IRS. Id. at 71.  These 750 customers are liable for approximately 3.7 million dollars of unpaid taxes, exclusive of penalties and interest.  Id.  This is a substantial and direct harm to those 750 taxpayers and the Government alike.

The gravity of the harms caused by Defendants is further shown by the persuasive testimony of customer Derrick Norton.  With two of his returns having been prepared by The Tax Experts, Norton testified that he was later audited by the IRS and now owes $10,000 in back taxes. Trial Tr. V.2 at 223.  Norton denied knowing he had done anything wrong until the IRS came to his mother and stepfather's home and told him that he was the "prime suspect" of their fraud investigation.  Id. at 223–232.  Norton's return claimed head of household status even though

---

[19] For comparison, another judge in this district found there to be "considerable" harm where a sample of 85 returns out of 87 examined contained false claims, "amounting to more than $460,000 in understated tax liabilities."  United States v. Pope, No. 15-11224, 2017 WL 5971665, at *9 (E.D. Mich. Nov. 30, 2017).  The court in Pope issued a permanent injunction barring the defendants from "ever engaging in the business of federal tax return preparation."  Id.

Norton told the preparer he lived with his mother and stepfather, who paid majority of the bills. Id. at 224–225.  His return also claimed household help income even though Norton worked as a window cleaner mainly doing commercial work and did not discuss housekeeping with the preparer.  Id. at 209–210, 222.  Norton testified that owing $10,000 to the IRS has taken a "tremendous toll" on him, especially now that he has a five-year-old-son.  Id. at 229.  He says he has "pretty much lost everything" and recently had to move because of the financial burden.  Id. He testified that he "can't explain enough that it's been horrible."  Id.

The 750 customers found to have fraudulent refunds by the IRS—as well as the extensive testimony of many former customers at trial—show that Defendants' preparation of fraudulent returns was widespread.  Conduct that "involv[es] hundreds of individual customers, their tax returns, and millions of dollars" is "in no way isolated, but is instead recurrent in nature." United States v. Elsass, 978 F. Supp. 2d 901, 940 (S.D. Ohio 2013), aff'd, 769 F.3d 390 (6th Cir. 2014). This is not a case where one preparer, or even one store, was preparing fraudulent returns.  The problem was much more widespread than that; the testimony clearly shows that all of Powell's stores and many preparers routinely violated IRS rules and regulations.

The Court finds that the first and fourth factors—the gravity of the harm caused by the offense and the isolated or recurrent nature of the infraction—weigh in favor of injunctive relief.

### b.  Extent of Powell's Participation and Degree of Scienter

The parties strongly disagree about the extent of Powell's participation and degree of scienter.  It is undisputed that Powell never prepared any tax returns herself and instead hired store managers who in turn hired preparers.  SOF ¶ 37.  But the Government contends that Powell actively directed her managers to implement fraudulent schemes at their stores and purposefully hindered the IRS investigation.  Pl. Br. Supp. PFFCL at 14–16.  Defendants, on the other hand,

argue that Powell concentrated on the administrative aspects of the business and was unaware of any fraud being committed by managers or preparers.  Def. Br. Supp. PFFCL at 4–5.  Considering all of the evidence, the Court agrees with the Government.

For one, it is obvious that Powell maintained close control of her employees.  Brandy Hawkins testified that Powell surveilled her stores using cameras with audio, held weekly manager meetings, and texted her managers "every day all day long."  Trial Tr. V.4 at 21–22, 113, 125.  Hawkins spoke with Powell daily and said that store managers were responsible for telling Powell how many customers their store served each day.  Id. at 125.

The evidence also shows that Powell knew how to manipulate returns to receive larger refunds.  Defendants emphasize that Powell did not have any formal education regarding taxes and had no tax-related work experience before opening her stores.  Def. Br. Supp. PFFCL at 3.  But multiple videos of Powell leading training sessions for her Tax Experts on the Go (TEotG) business prove that Powell was not only familiar with the concepts of filing status, Schedule C income, the EITC, and the AOC, but that she also knew how to falsely report these items to maximize refunds.

For example, in one video, someone asks Powell what to do if a customer does not know how much self-employment income they made.  Pl. Ex. 43.  Powell explains how to "probe" the customer into providing a number that will maximize their refund (presumably their EITC amount, although that is not specified in the video): "You're supposed to say . . . . 'If you get anywhere from fourteen to seventeen thousand, you could get a refund anywhere from five to eight thousand. How much money do you make?'  And if they don't understand, you repeat the question until they give you 'Oh I make about 17,000.'"  Pl. Ex. 43.  In another video, Powell tells a training participant to change the amount of gross receipts claimed on the taxpayers Schedule C from $4,000 to $16,000 to increase the taxpayer's refund.  Pl. Ex. 41.

Defendants argue that these videos are irrelevant to the Government's case because TEotG was a separate business that had nothing to do with The Tax Experts, and none of the people enrolled in TEotG worked at Powell's stores.  Def. PFFCL at 23.  While Defendants are correct that these videos do not prove that Powell directly instructed anyone at The Tax Experts to falsify returns, they do show that Powell was knowledgeable regarding the tax schemes that her preparers employed.

Further, these videos show that Powell is not a credible witness.  Encouraging other preparers to fraudulently prepare returns shows that Powell has a propensity for untruthfulness. Powell also testified that she has been convicted of conspiring to commit mortgage fraud and violating Michigan notary public laws.  Trial Tr. V.8 at 124–126, 175–176.  The Court can consider these prior convictions for crimes involving a dishonest act or false statement in assessing Powell's character for truthfulness.  See Fed. R. Evid. 609.  Powell's TEotG videos, in conjunction with her prior convictions, lead the Court to believe that Powell's testimony must be viewed through a skeptical lens.

Even if the Court were to assume Powell did not direct her employees to prepare fraudulent returns, Powell cannot reasonably argue that she did not know or have reason to know that returns were being prepared improperly.  Powell admitted that she hired preparers without tax preparation backgrounds and that she was responsible for deciding what training those preparers would receive.  Trial Tr. V.8 at 147–149.  Each preparer only received between 15 and 25 hours of training, which Powell has since admitted was not enough.  Id.  Powell knew that preparers relied heavily on forms provided by The Tax Experts when preparing returns, and Powell was responsible for deciding what forms would be used.  Tr. V.4 at 124.  Yet these forms were often inadequate and did not ask enough questions to be relied upon completely by preparers.

21

For example, the HSH form Powell's preparers had customers fill out did not ask any questions relevant to determining whether the taxpayer qualified as an employee, such as whether the taxpayer offered services to the general public, or who provided the taxpayer's supplies.  Pl. Ex. 53 (Tax Experts Forms) at PE0733–PE0734; Trial Tr. V.4 at 37–38.  The form simply asked how many employers the taxpayer has, how often they perform services for their employers, if they perform the job duties at the employer's home, and to list the taxpayer's duties.  Id.  A taxpayer filling out the form would have no reason to think that there is a statutory test for qualifying as a HSH employee, and a preparer would be unable to properly determine the taxpayer's status based on the form alone.

In addition, Powell implemented a fee and bonus structure that incentivized employees to prepare fraudulent returns.  Customers at Powell's stores paid a base price to have a tax return prepared—for example, $350 in 2020–2021—but also had to pay extra fees for any additional forms prepared, such as forms for Schedule C, HSH income, or the AOC.  Pl. Ex. 47 (2020–2021 Tax Experts Fee Sheet).  The fees associated with these forms ranged from $25 to $300, with the HSH and Schedule C forms being the most expensive.  Id.; Trial Tr. V.4 at 42.  Store managers were paid a small base salary but were also eligible for bonuses if their stores collected enough fees from customers.  Pl. Ex. 32 (Hawkins Job Offer Letter); Trial Tr. V.4 at 42–44.  Similarly, preparers split a store bonus if their store made a certain amount of money in a particular year.  Id. at 45.  This compensation structure created a clear incentive for preparers to encourage customers to report fake HSH income and Schedule C losses, as these forms generated the most fees.  Defendants argue that "[t]he charge for preparation of a tax return was not affected by the amount

of the refund" because preparers were paid by the hour.  Def. Br. Supp. PFFCL at 7.  But this argument fails to account for fees and bonuses.[20]

Not only does Defendants' argument that "[Powell] did not tell the tax preparers what to do" seem unlikely given the evidence presented at trial, it also fails to absolve Powell from responsibility even if it were true.  In <u>Stinson</u>, the defendant—like Powell—was the sole owner of multiple tax stores.  <u>Stinson</u>, 239 F. Supp. 3d at 1321.  The court found that the Defendant "either knew or should have known that his employees were improperly preparing tax returns given the pattern of false claims made on numerous tax returns."  <u>Id.</u>  The same pattern of false claims is present in this case.  Further, the <u>Stinson</u> court explained that "[u]ltimately, as the owner of the stores, Stinson is responsible. If he did not instruct his preparers to wrongfully claim these amounts on their customers' returns, he played an integral role by failing to oversee his own employees and correcting this practice."  <u>Id.</u>  The same can certainly be said of Powell.

### c.  Powell's Recognition of Culpability

This factor strongly favors the Government.  At trial, Powell took no responsibility for the fraudulent tax returns prepared by her stores and instead placed blame on The Tax Experts, Inc. (owned by Jeanisia Allen), Powell's preparers, and Powell's customers.  According to Defendants, "The Tax Experts trained Annetta Powell that the client was always right and if they filed out the questionnaires then that information should go on their tax return."  Def. SOF ¶ 11.  But Powell also testified that The Tax Experts training manual instructed preparers to ask follow-up questions

---

[20] Defendants maintain that "there was no bonus structure at The Tax Experts," Def. SOF ¶ 131, citing the testimony of preparers Rhimes and Ajenae Nychole Bland, who each testified that there were no bonuses.  Trial Tr. V.10 at 22, 108.  But when pressed by the Government, Rhimes admitted that there was a possible store bonus and that her offer letter indicated that her salary was based on sales.  Trial Tr. V.10 at 22, 73–74.  This testimony, along with the bonus information included in Hawkins's offer letter, Pl. Ex. 32, convinces the Court that a bonus structure did in fact exist at The Tax Experts.

if information provided by the taxpayer seemed incomplete, inconsistent, or illogical.  Tr. Tr. V.11 at 20–21.  Powell cannot blame The Tax Experts for her refusal to conduct the required due diligence while preparing returns.

Even more concerning are Powell's actions during the IRS investigation.  The first time Powell spoke with Agent Nelson regarding the investigation, Powell told Nelson that she did not have any documents to provide and that her businesses were closed because she had been in prison.  Trial Tr. V.1 at 53–55; Trial Tr. V.8 at 199–203.  Yet Powell admits that her businesses were still open and running while she was in prison.  Trial Tr. V.8 at 199–202.  Powell does not remember the conversation well, but the Court credits Agent Nelson's version of the events because she testified to preparing a contemporaneous memorandum documenting the call.  Trial Tr. V.1 at 54.  Powell instructed Nelson to conduct the investigation without her cooperation and refused to schedule an in-person meeting with her.  Id.; Trial Tr. V.8 at 202–203.  She never met with or provided the IRS with any documents during their investigation.  Trial Tr. V.8 at 211.

Not only did Powell not cooperate with the investigation, but the evidence shows that she actively tried to thwart it.  In 2019, four years after the IRS fined Jasmine Garcia for improperly filing returns claiming both Schedule C and HSH income, Powell's preparers were still filing returns with the same issue.  Trial Tr. V.8 at 186–190.  The IRS started holding back the refunds for some of these customers, which Powell eventually realized.  Trial Tr. V.4 at 48–49.  Attempting to divert IRS investigators and make sure her clients still received their refunds, Powell instructed Hawkins and three other preparers to amend customer returns so that HSH income was reported as Schedule C income instead.  Id.  Powell instructed the preparers to modify both the customers' returns and their files with The Tax Experts—all without informing the customers or obtaining

their permission.  Id.  According to Brandy Hawkins, one preparer was fired for refusing to sign customer names on amendments without the customer present.  Id. at 50.

Brandy Hawkins testified that Powell again instructed her to change customer files without customer permission after the United States filed its complaint in this action.  This time, Brandy Hawkins refused to follow Powell's instructions and was fired.  Trial Tr. V.4 at 58–70.  Brandy Hawkins testified credibly that, unlike in 2019, she felt uncomfortable making these changes because the complaint in this case had already been filed and she knew Powell was not supposed to be altering documents.  Id. at 54–55, 64.

 Defendants argue that Brandy Hawkins was not credible because she was fired for filing tax returns without the necessary documentation, Def. Br. Supp. PFFCL at 9–10.  But the Court has previously stated that it finds Hawkins's testimony credible.  See n.12 above.  Further, Powell's testimony regarding the events that unfolded with Brandy Hawkins after the United States filed its complaint was contradictory and hard to follow.  See Trial Tr. V.9 at 23–33.

In addition to altering customer returns and files, Powell tried circumventing the IRS investigation by manipulating the use of an Electronic Filing Identification Number (EFIN)—the number assigned by the IRS to a tax preparer—which is used to monitor the returns preparers submit.  IRS regulations require any tax return preparer who anticipates preparing and filing 11 or more Forms 1040, 1040A, 1040EZ, and 1041 during a calendar year to obtain an EFIN and use IRS e-file to file all returns they prepare.  SOF ¶ 43.  Obtaining an EFIN requires an application process and suitability check.  Id.  Powell was not eligible to obtain her own EFIN number because of her criminal record, so her stores always utilized EFIN numbers under someone else's name. Trial Tr. V.1 at 66–67.  The IRS expelled Danielle Thomas, who held the EFIN used by Powell's stores, from the IRS e-filing program in 2020.  Trial Tr. V.1 at 66. Agent Nelson testified that the

purpose of revoking Thomas's EFIN number was to stop The Tax Experts stores from preparing returns electronically. Id. at 67–68. Powell circumvented the IRS's efforts by hiring her makeup artist Lowell Kennedy as an administrative assistant and having him obtain an EFIN in his name. Trial Tr. V.9 at 12–14. Powell admitted that Kennedy had no prior experience as an administrative assistant and that Kennedy was not aware that Thomas's EFIN had been revoked. Id. at 12–13.

All of these actions support the conclusion that Powell did not acknowledge her culpability.

### d.  Mitigation Efforts

Defendants do not address any of the Gleason factors directly, but they argue that Powell took prompt steps to address IRS concerns after learning about the investigation. Def. Br. Supp. PFFCL at 23. According to Defendants: "[O]nce Annetta saw the Rachel Nelson report dated January 25, 2018, she knew changes needed to be made." Id. Powell testified regarding new procedures for HSH income, Schedule C income, and HoH filing status. Referring to HSH income as "banned" at Speedy Tax Stores, Powell testified that customers reporting HSH income are required to provide a notarized letter from an employer and that zero of the 1,660 returns prepared by Speedy Tax Stores in 2022 reported HSH income. Trial Tr. V.9 at 139–140. Powell also explained that Speedy Tax Stores requires receipts and bank statements for Schedule C income, as well as documentation showing that spouses live separately for married individuals filing as head of household. Id. at 140–143. In addition, Powell has attended multiple tax trainings since 2022 and now requires all preparers and managers to take a 20-hour IRS-approved course and pass an exam. Id. at 147; Trial Tr. V.10 at 205. She also reduced the number of Speedy Tax Stores from five to two so she can be more involved in their operation and has testified that she would only operate one store in the future if Speedy Tax Stores is permitted to prepare tax returns. Trial Tr. V.9 at 148–149; Trial Tr. V.11 at 107 (Dkt. 164).

The Court credits Powell's testimony regarding newly implemented procedures at Speedy Tax Stores but finds that these changes were made too late to make amends for her earlier attempts to frustrate the IRS's investigation.  Powell admitted that, as late as 2021, returns that improperly reported both Schedule C and HSH income for doing the same work for the same people were still being prepared in violation of the Internal Revenue Code.  Trial Tr. V.8 at 193–196.  Powell was first made aware of IRS concerns regarding her stores—and returns involving Schedule C and HSH income in particular—in 2014.  Her attempt to make improvements beyond the eleventh hour, when she was facing the threat of a permanent injunction, does not help her case.

### e.  Likelihood of Future Violations

Defendants argue for a limited injunction enjoining Powell from reporting incorrect: (i) filing status for married persons as head of household; (ii) Earned Income Tax Credits; (iii) Schedule C income or expenses; (iv) education credits; and (v) HSH income.  Def. COL ¶ 6.  In support of their position, Defendants rely on a case where the district court enjoined the defendant from engaging in limited types of fraudulent conduct rather than issuing a broad, permanent injunction, in large part because of the remedial measures the defendant took after learning of the IRS investigation of tax preparation business.  United States v. Cruz, 611 F.3d 880, 883–884 (11th Cir. 2010).  Cruz is distinguishable from the current case because, as already discussed, Powell's stores continued preparing fraudulent returns for years after the IRS investigation began.  The fact that Powell has taken remedial measures with Speedy Tax Stores is too little, too late.

Further, given the extensive range of prohibited conduct in which Defendants engaged, a broad and permanent injunction is necessary to prevent future reoccurrence.  See United States v. Hall, No. 12-cv-00893, 2013 WL 6989540, at *9 (W.D. Mo. Sept. 24, 2013), aff'd (June 18, 2014) (finding that "[a]ny injunction that would be pointed toward specific conduct . . . would likely not

deter other kinds of conduct in which [Defendant] currently engages or might engage in the future" where Defendant's conduct "encompassed a broad range of false claims and deductions").

Powell's history of fraudulent activity leads the Court to believe that if it were to enjoin her from engaging in specific conduct, she would likely find new ways to prepare fraudulent returns. Powell has previously been convicted of conspiracy to commit mortgage fraud, for which she served time in federal prison. Trial Tr. V.9 at 62–63. After being released from prison and switching careers into the tax preparation business, Powell ran stores that again engaged in fraudulent activity. This history, combined with Powell's attempts to frustrate the IRS investigation and her refusal to take responsibility for her actions, lead the Court to believe that an injunction permanently barring Defendants from preparing tax returns for others is appropriate.

### B. Permanent Injunction Under § 7402(a)

In addition to § 7407, a permanent injunction is also warranted under § 7402(a). Section 7402(a) grants district courts broad authority to issue injunctions "as may be necessary or appropriate for the enforcement of the internal revenue laws." 26 U.S.C. § 7402(a). The authority provided under § 7402(a) is "in addition to and not exclusive of any and all other remedies" available to enforce the internal revenue laws. Id. The Sixth Circuit has held that "because [section 7402(a)] expressly authorizes the issuance of an injunction, the traditional requirements for equitable relief need not be satisfied." United States v. ITS Fin., LLC, 592 F. App'x 387, 400 (6th Cir. 2014). The Sixth Circuit has emphasized the "expansive scope" of the statute and has even held that the statute provides authority to enter an injunction when there is no violation of the internal revenue laws. Id. at 394–395.

An injunction under § 7402(a) is warranted where there is a pattern of gross negligence or recklessness. Stinson, 239 F. Supp. 3d at 1324–1325 (punctuation modified). The Sixth Circuit

28

has approved of considering the <u>Gleason</u> factors when analyzing whether an injunction is warranted under § 7402(a).  <u>ITS Fin., LLC</u>, 592 F. App'x at 400.  For this reason, the analysis of the <u>Gleason</u> factors described above applies under § 7402(a) as well.  The evidence shows that Defendants engaged in a clear pattern of gross negligence or recklessness by including false information on customer returns to maximize customer refunds and store preparation fees.  A permanent injunction barring Defendants from acting as tax return preparers is warranted under both § 7407 and § 7402(a).

### C. Good-Faith Exception

Defendants' main argument is that "as a matter of law, conduct by a defendant made in good faith is not to be included as conduct subject to penalty under § 6694," citing § 6694(a)(3), the reasonable cause exception to § 6694(a).  Def. COL ¶ 2.  But as the Court has discussed in detail, the evidence shows that Powell has not acted in good faith.  Powell's stores operated a fraudulent tax scheme for years until the United States filed its complaint in this action.  Before taking any remedial steps with her new company, Speedy Tax Stores, Powell attempted to mislead and delay IRS investigators.  The § 6694(a)(3) exception does not apply to Powell.

Defendants also argue that an injunction is not warranted because the United States violated the "clean hands" principle by not providing Powell or her attorney with the results of the IRS investigation when it was completed in 2018.  Def. Resp. to Pl. PFFCL at 1–2.  But as discussed above, Powell first spoke with Agent Nelson regarding the investigation in 2016 and refused to cooperate with the investigation.  Further, because the Sixth Circuit has held that "the traditional requirements for equitable relief need not be satisfied" for an injunction under § 7402(a), Defendants' clean hands argument fails regardless of whether the Government has clean hands. <u>ITS Fin., LLC</u>, 592 F. App'x at 400.

**D. Disgorgement Under § 7402(a)**

The Government seeks disgorgement of Defendants' net profits from certain categories of fraudulently prepared tax returns for preparation years 2019–2021 totaling $689,797.91.  Pl. Br. Supp. PFFCL at 24.  In particular, the Government seeks disgorgement of net profits from returns (i) claiming HSH income and (ii) reporting false business expenses on a Schedule C in the amount of $5,000 or more (but not reporting HSH income).  Id. at 23.

This Court's authority to issue injunctions under § 7402(a) includes the remedy of disgorgement.  See, e.g., United States v. RaPower-3, LLC, 343 F. Supp. 3d 1115, 1193 (D. Utah 2018), aff'd, 960 F.3d 1240 (10th Cir. 2020); United States v. Stinson, 729 F. App'x 891, 899 (11th Cir. 2018).  Disgorgement is designed to prevent unjust enrichment by preventing a defendant from profiting from its wrongdoing.  See Stinson, 729 F. App'x at 899.  Disgorgement also "reminds the defendant of its legal obligations, serves to deter future violations of the Internal Revenue Code, and promotes successful administration of the laws."  United States v. Mesadieu, 180 F. Supp. 3d 1113, 1119 (M.D. Fla. 2016).

Defendants discuss disgorgement only briefly in their post-trial submissions, arguing that disgorgement is not warranted because Powell has acted in good faith.  Def. COL ¶ 14; Def. Resp. to Pl. PFFCL at 15.  This argument fails because, as explained at length above, the Court finds that Powell has not acted in good faith.  Given the extent of Defendants' fraudulent conduct, the Court finds that disgorgement is warranted.  The only question remaining is whether the Government's proposed calculation is appropriate.

"To be entitled to disgorgement, the Government need only produce a reasonable approximation of the defendant's ill-gotten gains."  Stinson, 729 F. App'x at 899.  "Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty

should fall on the wrongdoer." Id. (punctuation modified).  Once the Government presents its estimate, the burden shifts to Defendants to show that the Government's estimate was not a reasonable approximation.  See Mesadieu, 180 F. Supp. at 1120.

Here, the Government presented a reasonable explanation of Defendants' ill-gotten gains. Considering the pattern of fraudulently prepared returns claiming false HSH income and Schedule C losses presented at trial, the Court finds that the two categories of returns included in the Government's calculation are reasonable.  Further, The Government's proposed calculation is a fair estimate of Defendants' net profits from fraudulent returns.  For each year between 2019 and 2021, the Government calculates Defendants' percentage of net profit by dividing the combined profits of Powell and her businesses by their reported gross receipts.  The Government then multiples the net profit percentage by the total amount of fees earned in that year for preparing returns in the two identified categories (not just the fees received from HSH and Schedule C forms).  This calculation estimates net profits received from fraudulent returns in the amounts of $216,531.59 (in 2019); $313,171.50 (in 2020); and $160,094.73 (in 2021)—for a total of $689,797.91.

Defendants have not met their burden of showing that the estimate was not reasonable. Defendants do not dispute the two categories of returns included in the Government's calculation. Defendants only argue that the calculation is incorrect because it is based on all profits generated from a given return, not just the fees charged for the HSH and/or Schedule C forms prepared for that return.  Def. Resp. to Pl. PFFCL at 15.  But this argument, urged without any supporting authority, is flawed.  Defendants cannot divide a return into fraudulent and non-fraudulent portions; a return containing any fraudulent information is fraudulent in its entirety.  Defendants'

"ill-gotten gains," therefore, include all profits received from fraudulently prepared returns, not just the specific fees charged for the fraudulent portion (or portions) of the return.

The Court finds that the Government's disgorgement calculation is a reasonable approximation of Defendants' ill-gotten gains and awards the Government $689,797.91.

### E. Evidentiary Objections

At various points during the trial and at the close of the trial, the Court instructed the parties to put in writing objections to exhibits whose admissibility the Court would consider post-trial. The Government has asserted objections to Defense Exhibits 6-10. Pl. Br. Supp. PFFCL at 24–25. Defendants object to Government Exhibit 54. Def. Br. Supp. PFFCL at 24.

Defense Exhibit 6 is a declaration that Lula Johnson provided to the IRS during the course of its investigation. The declaration states that she did not tell a Tax Experts preparer that she had made $16,578 in household help income in 2016. Defendants seek its admission as a prior inconsistent statement because, at trial, Johnson testified that she does not remember meeting with an IRS agent or signing a written declaration for the IRS in June 2017. Def. COL ¶ 9; Trial Tr. (Dkt. 152) at 222–223. Defendants argue that this prior inconsistent statement shows that Johnson's testimony is unreliable. Def. SOF ¶ 220.

The Government says the exhibit is not admissible under Federal Rule of Evidence 608(b) because it is extrinsic evidence to show an act evidencing Johnson's character for truthfulness. Pl. Br. Supp. PFFCL at 24–25. The Government also objects on the grounds that its admission is sought under the doctrine of "impeachment by contradiction," which the Government asserts the Sixth Circuit has not endorsed. Id. at 25.

But the Government does not address the theory for admissibility that Defendants propose, i.e., Federal Rule of Evidence 613. That rule allows impeachment by a prior inconsistent statement

32

and permits proof of the prior statement by way of extrinsic evidence.  Nonetheless, Exhibit 6 will not be admitted.  Johnson did not testify that she did not meet with an IRS agent or that she did not sign a declaration; she said she did not remember those matters.  Trial Tr. (Dkt. 152) at 222–223.  Thus Exhibit 6 is not actually a prior inconsistent statement.  A prior statement must be "inconsistent" to come within the rule allowing its use for impeachment.  United States v. Rogers, 549 F.2d 490, 495 (8th Cir. 1976) ("The first requirement, of course, is that the statements be inconsistent.").  The Court will deny its admission for that reason.

On the same grounds urged in opposition to Defense Exhibit 6, the Government objects to Defense Exhibit 7 (Velvetann Jones's 2016 customer file) and Defense Exhibit 8 (Powell's judgment of conviction for bank fraud conspiracy).  Both documents were offered by the defense to impeach Jones.  Assertedly, Exhibit 7 contains various entries from Jones's customer file that are allegedly inconsistent with her trial testimony.  Exhibit 8—Powell's judgment of conviction for bank fraud—reflects the date Powell was to report to prison.  This allegedly contradicts Jones's testimony that she met with Powell for a tax preparation session, because the meeting date was after the date when Powell was to start her sentence and Powell would have been in custody.  The Government's objections, however, are moot because the Court does not take into account Jones's testimony in reaching its decision in this case.

Defense Exhibit 9 is a certificate filed with the state of Michigan document showing that Brandy Hawkins was a "member" of the LLC that owned Elite Tax Pros, a rival tax preparation firm, which she allegedly established after separating from Tax Experts.  Defendants offered it to show that Hawkins was not a "reliable witness," Def. SOF ¶ 92, based on the fact that she denied being the "owner," despite the document showing that she was a "member" of the LLC that owned the business.  But the defense does not explain exactly what it means by "reliable witness."  The

defense does not explain whether the concern is with a faulty memory or dissembling or some other issue. And it does not explain how the document would support any such theory. The Court need not fashion an argument for a litigant who neglects to do so. See United States v. Mungarro, No. 07-20076, 2020 WL 1933816, at *3 (E.D. Mich. Apr. 22, 2020) ("It is not the court's responsibility to craft winning legal arguments for [the parties]."). In any event, Hawkins agreed that she was a "member" of the LLC; what she denied was that she was the "owner." Whatever distinction she may have had in mind, she did not contradict what was written in the document. As explained above, impeachment by prior inconsistent statement—if that is the defense theory— has no application where there is no inconsistency. And "impeachment by contradiction"—even it is an available doctrine—can have no application where there is no contradiction.[21] Exhibit 9 will not be admitted.

Defense Exhibit 10 is a text message exchange between Hawkins and another individual, supposedly showing Hawkins's animosity toward Powell. Defendants offered this exhibit to show that Hawkins was biased. Def. COL ¶ 13. The Government objects based on Federal Rule of Evidence 608, which prohibits proving or disproving a witness's "character for truthfulness" through extrinsic evidence of "specific instances of conduct." Proving a witness's bias has nothing to do with "character for truthfulness," and as such is not barred by FRE 608. See United States v. Abel, 469 U.S. 45, 51 (1984) ("The Courts of Appeals have upheld use of extrinsic evidence to show bias both before and after the adoption of the Federal Rules of Evidence . . . . We think the

---

[21] The Sixth Circuit has made different pronouncements regarding the availability of "impeachment by contradiction," which allows extrinsic evidence to contradict the testimony of a witness in certain circumstances. Compare United States v. Craig, 953 F.3d 898, 905 (2020) ("[W]e have expressed skepticism as to whether impeachment by contradiction is permissible in this circuit . . . ."), with United States v Markarian, 967 F.2d 1098, 1101–1103 (allowing extrinsic evidence to impeach the defendant's testimony denying ever using drugs). That debate is irrelevant to the instant case.

lesson to be drawn from all of this is that it is permissible to impeach a witness by showing his bias."). Nor does the doctrine of "impeachment by contradiction" have any application. The impeachment here does not seek to contradict what Hawkins said; it is offered to show she is biased.

The only objection raised by the defense pertains to the Government's Exhibit 54, which is Agent Nelson's memorandum of her telephone call with Dennis Kent, an attorney who represented Powell during the IRS investigation. The memorandum states that Kent told her that Powell had no business records. The defense objection asserts only that the memorandum is hearsay and does not qualify as a business record because it was prepared in anticipation of litigation. See Timberlake Const. Co. v. U.S. Fid. & Guar. Co., 71 F.3d 335, 342 (10th Cir. 1995) ("It is well-established that one who prepares a document in anticipation of litigation is not acting in the regular course of business.") (citing Palmer v. Hoffman, 318 U.S. 109, 114 (1943)). The Government offers no refutation of that proposition. The defense objection, therefore, is sustained.

## IV.   CONCLUSION

The Court finds in favor of the Government and permanently enjoins Defendants from acting as tax return preparers. The Court also orders Defendants to disgorge $689,797.91 to the Government.

A separate judgment will be issued.

SO ORDERED.

Dated:  March 29, 2024                                   s/Mark A. Goldsmith
      Detroit, Michigan                              MARK A. GOLDSMITH
                                   United States District Judge